# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| JAMES GARRETT, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 06-CV-4137-NKL |
| ) | (Consolidated with Case Nos. 06-CV- |
| GEORGE MARTIN ALBRIGHT, JR., et al.,) | 0785, 06-CV-4139, 06-CV-4209 and 06- |
| ) | CV-4237) |
| Defendants. ) | |

## ORDER

This case involves five lawsuits that arose from a June 1, 2006 automotive accident on Interstate 70 in which four people died and several others were injured. The defendants are George Martin Albright, Jr.; Trucker's Plus HR, Inc. ("Trucker's Plus"); Resolve Staffing, Inc. ("Resolve Staffing"); Logistics Services, Inc. ("Logistics Services"); GLS LeasCo Corporation ("GLS Leasco"); Logistics Insight Corporation ("Logistics Insight"); CenTra, Inc. ("CenTra"); Central Transport, Inc. ("Central Transport"); and Pro Logistics, Inc. ("Pro Logistics").

Pending before the Court is CenTra's Motion for Summary Judgment [Doc. # 107]; CenTra's Motion to Strike Certain of Plaintiffs' Exhibits, which is contained within its reply to Plaintiffs' response to its motion for summary judgment; and Plaintiffs' Motion for a Continuance for the purpose of conducting additional discovery. For the reasons stated herein, CenTra's Motion for Summary Judgment is granted, CenTra's Motion to Strike is denied as moot and Plaintiffs' Motion for a Continuance is denied.

1

**I.     Facts**

On June 1, 2006, George Albright, Jr. was driving the tractor-trailer that caused the accident that is the subject of this case. On that date, Albright was an employee of Trucker's Plus, which is a division of Resolve Staffing, and was working as a commercial driver for Pro Logistics.

Pro Logistics is an operational commercial motor carrier. LINC Logistics Company ("LINC"), a subsidiary of CenTra, is the parent company of Pro Logistics. CenTra is an investment and holding company that owns and manages a portfolio of investments, including approximately 50 subsidiary and affiliated companies. CenTra has complete ownership of LINC and, until the end of 2006, CenTra owned 100% of the stock of Pro Logistics.

CenTra, LINC and Pro Logistics all maintain their business and registered offices at 12225 Stevens in Warren, Michigan. At the time of the accident, several other CenTra subsidiaries and affiliates also maintained their office at 12225 Stevens, including Logistics Insight, GLS Leasco, Central Transport and Central Transport International, Inc. ("Central Int'l"). At 12225 Stevens, CenTra shares receptionist services with its related companies.

In their most recent annual reports, both LINC and Pro Logistics identified Mr. H. E. Wolfe as one of their corporate officers. In Pro Logistics most recent annual report, it also identified M. D. Akkanen as an officer. Akkanen was identified as an officer in one of LINC's prior annual reports. Neither LINC nor Pro Logistics has officers in common

with CenTra, though CenTra has officers in common with several of the other defendant subsidiaries and affiliates.

Mr. Larry Cox, a LINC employee operating on behalf of Pro Logistics, signed a driver release agreement with Trucker's Plus. The agreement required Pro Logistics to obtain liability insurance in the amount of $1,000,000 per person. Pro Logistics never purchased the level of coverage required by the driver release agreement. Instead, Pro Logistics obtained a commercial trucking liability insurance policy that provided coverage in the amount of $1,000,000 per occurrence for the policy period of January 1, 2006 through January 1, 2007. Pro Logistics does not own any property or equipment.

## II. Discussion

### A. Piercing the Corporate Veil

CenTra has moved for summary judgment on the grounds that it "did not employ Mr. Albright, control his conduct, have a right of control over his conduct, or own/operate any vehicle involved in the accident." According to CenTra, it "is merely a holding company and had no federal motor carrier authority, did not own any tractors or trailers, did not employ or contract any drivers, did not broker, dispatch, or otherwise procure transportation freight, nor provide logistics or trucking services." (Doc. 108 at 3). For their part, Plaintiffs argue that CenTra "controls its subsidiaries and affiliates to such an extent that these subsidiaries and affiliates do not have a separate corporate existence." (Doc. 163 at 24). In other words, Plaintiffs argue that the corporate veil separating

3

CenTra from its subsidiaries and affiliates should be pierced, thereby allowing Plaintiffs to hold CenTra responsible for the torts committed by its subsidiaries and affiliates.

In general, a party injured by the actions of a corporation or a corporation's employee or agent may only achieve recovery against the corporation's assets or those of its employee or agent. *Radaszewski v. Telecom Corp.*, 981 F.2d 305, 306 (8th Cir. 1992). A corporation's shareholders, including, where applicable, its parent corporation, are not held responsible for the corporation's or its employee's tortious conduct. *Id.* In *Radaszewski*, the Eighth Circuit commented that

> [t]his is a conscious decision made by the law of every state to encourage business in the corporate form. Obviously the decision has its costs. Some injuries are going to go unredressed because of the insolvency of the corporate defendant immediately involved, even when its shareholders have plenty of money.

*Id.*

An injured party may reach the assets of a corporation's shareholders by "piercing the corporate veil." Under Missouri law, a plaintiff seeking to pierce a corporate veil must show:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

4

> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Collet v. American National Stores, Inc.*, 708 S.W.2d 273, 284 (Mo. Ct. App. 1986).

Assuming that Plaintiffs are able to satisfy the first *Collet* requirement by showing that CenTra controlled its affiliates and subsidiaries such that the affiliate or subsidiary had "no separate mind, will or existence of its own," Plaintiffs must then show that CenTra used that control to commit fraud or wrong.

The only argument that Plaintiffs put forth concerning the second *Collet* requirement is that CenTra committed a wrong by undercapitalizing Pro Logistics. *Collet*, 708 S.W.2d at 286 ("Examples of such wrongs as would satisfy [the second *Collet* requirement] include actual torts, violations of statutory duties, undercapitalization, or the stripping of assets from the subservient corporation."); *Real Estate Invs. Four, Inc. v. American Design Group Inc.*, 46 S.W.3d 51, 57 (Mo. Ct. App. 2001) ("Actual fraud is not required to justify piercing the corporate veil; violation of statutory duties or undercapitalization may be sufficient.").

The Eighth Circuit case, *Radaszewski v. Telecom Corp.*, is analogous to the instant action. In *Radaszewski*, the plaintiff was injured when his motorcycle collided with a truck driven by an employee of the defendant parent company's subsidiary. In an attempt to pierce the corporate veil separating the defendant parent company and its subsidiary, the plaintiff argued that *Collet*'s second requirement was satisfied because the subsidiary was undercapitalized. Central to the *Radaszewski* court's holding was the effect of insurance on the capitalization question:

5

> The whole purpose of asking whether a subsidiary is "properly capitalized," is precisely to determine its "financial responsibility." If the subsidiary is financially responsible, whether by means of insurance or otherwise, the policy behind the second part of the *Collet* test is met. Insurance meets this policy just as well, perhaps even better, than a healthy balance sheet.

*Id*., 981 F.2d at 309. Moreover,

> [i]nsurance is unquestionably relevant on the issue of "undercapitalization." The existence of insurance goes directly to the question of the subsidiary's financial responsibility. If a parent has established a financially responsible subsidiary, then that subsidiary is not "undercapitalized" in the only sense that matters for present purposes. That subsidiary, in other words, is not unable to meet its obligations. It therefore cannot have been established by the parent, either deliberately or recklessly, in an effort to avoid obligations or to make them difficult to collect . . . Here, it is beyond dispute that [the subsidiary] had insurance, and that it was considered financially responsible under the applicable federal regulations.

*Id*. at 310.

The *Radaszewski* court concluded that the subsidiary in its case was not undercapitalized because it maintained insurance sufficient to satisfy the financial responsibility requirement of the Federal Motor Carrier Safety Regulations. As a result, the court held that *Collet*'s second requirement had not been met. *Id*.

The Federal Motor Carrier Safety Regulations require motor carriers to "obtain and [have] in effect . . . minimum levels of financial responsibility as set forth in § 387.9." 49 C.F.R. § 387.7. The regulations define financial responsibility as "the financial reserves (e.g., insurance policies or surety bonds) sufficient to satisfy liability amounts set forth in this subpart covering public liability." 49 C.F.R. § 387.5. The minimum level of

6

financial responsibility required of common carriers of property is $750,000. 49 C.F.R. § 387.9; 49 C.F.R. § 387.03.

On June 1, 2006, George Albright was driving a tractor-trailer pursuant to a driver release agreement between Pro Logistics and Trucker's Plus. The driver release agreement required Pro Logistics to procure and maintain insurance coverage of at least $1,000,000 per person. Pro Logistics, however, only carried liability insurance in the amount of $1,000,000 per occurrence. No evidence has been submitted that Pro Logistics ever sought additional coverage as a result of the driver release agreement, and Pro Logistics has no umbrella or excess insurance coverage from which it could draw to satisfy a judgment that exceeds $1,000,000. Moreover, Pro Logistics has no other assets (e.g., real estate or equipment) from which a judgment could be satisfied. Thus, Plaintiffs argue, CenTra undercapitalized Pro Logistics by not acquiring liability insurance as specified by the driver release agreement. CenTra, on the other hand, argues that Pro Logistic was not undercapitalized because its $1,000,000 per occurrence insurance policy exceeded the amount of insurance coverage deemed financially responsible by the Federal Motor Carrier Safety Regulations.

The issue before the Court is whether Pro Logistics was undercapitalized. In *Radaszewski*, the Eighth Circuit held that a motor carrier subsidiary is not undercapitalized if it maintains insurance sufficient to satisfy the financial responsibility requirement of the Federal Motor Carrier Safety Regulations. While the Court understands why a reasonable person might disagree with the Eighth Circuit's ruling in

*Radaszewski*, the Court is bound by it and finds the reasoning of the Eighth Circuit in that case is applicable to the facts of this case. Because Pro Logistics maintained liability insurance coverage in excess of that required by the Federal Motor Carrier Safety Regulations, Pro Logistics was not undercapitalized on June 1, 2006, as a matter of law, for purposes of this lawsuit. Therefore, Plaintiffs cannot satisfy *Collet*'s second requirement and cannot pierce the corporate veil separating CenTra from its subsidiaries and affiliates.

### B. Plaintiffs' Alternative Motion for a Continuance

In the alternative, Plaintiffs argue that the Court should not grant CenTra's Motion for Summary Judgment and should grant Plaintiffs a continuance to conduct additional discovery "because defendants have yet to produce for deposition all of the witnesses with knowledge about the structure of and relationships among the CenTra, Inc.-affiliated companies that are defendants in this case." (Doc. 163 at 24). In the previous section, the Court assumed that Plaintiffs could satisfy *Collet*'s first requirement–that CenTra controlled its affiliates and subsidiaries such that the affiliate or subsidiary had "no separate mind, will or existence of its own." Even with this assumption, Plaintiffs were unable to satisfy the second prong of *Collet*. Given that Pro Logistics was not undercapitalized, the discovery proposed or planned by Plaintiffs would not uncover any information that would change the Court's ruling on Centra's motion. Therefore, Plaintiffs' alternative motion for a continuance is denied.

## III. Conclusion
8

Case 2:06-cv-04137-NKL   Document 257   Filed 08/09/07   Page 8 of 9

Accordingly, it is hereby

ORDERED that CenTra's Motion for Summary Judgment is GRANTED;

ORDERED that CenTra's Motion to Strike Plaintiffs' Exhibits J and K is DENIED AS MOOT; and

ORDERED that Plaintiffs' Alternative Motion for a Continuance is DENIED.

       s/ Nanette K. Laughrey
       NANETTE K. LAUGHREY
       United States District Judge

Dated: August 9, 2007
Jefferson City, Missouri