IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

JAMES GARRETT et. al.,                )
                                      )
                Plaintiffs,           )
                                      )
v.                                    )        Case No. 4:06-CV-4137-NKL
                                      )
GEORGE MARTIN ALBRIGHT, JR.,          )
PRO LOGISTICS, INC. et al.,           )
                                      )
                Defendant.            )

## MEMORANDUM AND ORDER

Pending before the Court is Plaintiffs' Motion for Sanctions [Doc. # 272] and

Defendants' Motions to Reconsider [Docs. ## 398, 399] and Motion to Strike Plaintiffs'

Motion for Sanctions [Doc. # 400].  Plaintiffs request the Court to strike Defendants'

pleadings and enter default judgment in favor of Plaintiffs.  Plaintiffs' Motion is DENIED

in part and GRANTED in part.  The Court strikes the pleadings of Central Transport, Inc.,

and enters a default judgment against Central Transport, Inc.  Lesser discovery sanctions

are imposed on Pro Logistics, Inc.  As to the other Defendants, Plaintiffs' Motion for

Sanctions is DENIED without prejudice.  Defendants' Motions are DENIED.

### A.      Background

1

This case involves four lawsuits arising from a fatal semi-truck collision on I-70 that occurred on June 1, 2006.[1]  George Albright Jr. ("Albright"), an employee of Truckers Plus HR, was driving under the authority of Pro Logistics, Inc. ("Pro Logistics"), at the time of the accident.  The Plaintiffs allege that the collision was caused in part by the failure of Defendants CenTra, Inc. ("CenTra"), Central Transport, Inc. ("Central Transport"), GLS LeaseCo ("GLS"), Logistics Insights ("LIC") and Logistics Services' ("LSI") to properly hire, supervise and train Albright.

The Federal Motor Carrier Safety Regulations impose on semi-truck drivers detailed record-keeping requirements as to how the drivers record their on-duty, off-duty and sleeping time during a 24-hour period.  The purpose of these regulations is to protect public safety by enforcing the maximum hours that a driver is permitted to drive.  *See* 49 U.S.C. § 31502(b).  Central Transport provided safety and logbook auditing services to Pro Logistics which leased Albright's tractor-trailer unit from GLS.  At the time of the collision, Central Transport, GLS and Pro Logistics were subsidiaries, either directly or remotely, of CenTra, a holding and investment company.

Throughout the discovery in this case, the parties have frequently sought the Court's intervention in discovery matters.  There have been no fewer than seven discovery conferences, most of which resulted from Defendants' conduct and for which

---

[1]On January 8, 2008, this Court dismissed Case No. 06-4237-CV-W-NKL pursuant to Fed. R. Civ. P. 41(a)(2).

2

the Court has already imposed sanctions on one occasion.[2]  The discovery process has

been complicated because of the opaque and overlapping relationship between the

Defendants.  While Defendants state "without hesitation" that there has been no

spoliation of "material" evidence, the record shows otherwise.  Defendants have

frequently obfuscated, misled and impeded the Court and the Plaintiffs during what is

supposed to be liberal discovery under the Federal Rules of Civil Procedure.  Primarily, at

issue in this motion for sanctions are missing logbooks, logbook audits and an accident

file maintained at different points by Central Transport and Pro Logistics.

As a threshold matter, while the Plaintiffs' motion refers generally to the

Defendants, the specific allegations of discovery abuse do not appear to include Albright,

LIC or LSI.  Sanctions, therefore, are inappropriate as to those Defendants.  The Court

will discuss only parties against whom specific conduct has been alleged - Central

Transport, GLS and Pro Logistics.[3]

B.      Legal Standards

A Court may impose a discovery sanction under Rule 37(b) of the Federal Rules of

Civil Procedure and the inherent authority of this Court.  *Chrysler Corp. v. Carey*, 186

F.3d 1016, 1019 (8th Cir. 1999).  Rule 37(b) sanctions are proper where there is a finding

---

[2]Defendants have asked the Court to reconsider its order granting Plaintiffs a spoliation instruction for the loss of the satellite tracking data [Doc. # 376].  That motion is under advisement and will be addressed separately.

[3]Neither party addressed whether CenTra and the other Defendants are responsible vicariously or directly for discovery abuses by sister or subsidiary corporations.  Therefore, the Court does not address that issue.

3

of (1) an order compelling discovery; (2) a willful violation of that order; and (3) prejudice. *Chrysler*, 186 F.3d at 1019. "Rule 37, interpreted consistent with its purposes, authorizes an award encompassing all expenses, whenever incurred, that would not have been sustained had the opponent conducted itself properly." *In Re Stauffer Seeds, Inc.*, 817 F.2d 47, 50 (8th Cir. 1987). Sanctions are also appropriately levied against a party responsible for causing prejudice when the party destroyed documents it knew or should have known were relevant to pending or potential litigation. *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993). Dismissal is a remedy available to the Court when a litigant's conduct abuses the judicial process. *See Keefer v. Provident Life & Accident Ins. Co.*, 238 F.3d 937, 941 (8th Cir. 2000). However, dismissal is an extreme sanction; the district court must choose the most appropriate sanction under the circumstances. *Chrysler*, 186 F.3d at 1022; *Comiskey v. JFTJ Corp.*, 989 F.2d 1007, 1009 (8th Cir. 1993).

In matters which lie beyond the scope of Rule 37, the Court relies on its inherent power to regulate litigation, preserve and protect the integrity of proceedings before it, and sanction parties for abusive practices. *Capellupo v. FMC Corp.*, 126 F.R.D. 545, 550-51 (D. Minn.1989).

### C.     Minor Discovery Abuses[4]

---

[4]The Court has not included all examples of problems it had supervising the Defendants during discovery. At discovery conferences, it was frequently difficult to get the Defendants to directly answer the simplest question.

Some of Defendants' conduct caused minor prejudice to the Plaintiffs but nevertheless gives context to the Defendants' persistent attempts to thwart the discovery process and conduct this litigation in bad faith. For example, on June 7, 2006, Plaintiffs sent GLS, the owner of the tractor-trailer unit, a preservation letter requesting it to preserve the tractor trailer unit for inspection by the Plaintiffs. (Pl. Ex. A-3). However, after receiving the letter, GLS placed the trailer back into service, rendering it "no longer . . . available for inspection in the condition it existed at the time of the accident." (Doc. 272, 24).[5]

Plaintiffs Interrogatory No. 16 requested the Defendants to state whether their company contracted with another company to perform logbook audits of its drivers. If so, to provide the contact information for that company. (Pl. Ex. C-2). Central Transport objected on the ground that "Mr. Albright was not an employee driving under Central Transport, Inc.'s authority at any time material." (Pl. Ex. G). Pro Logistics stated "Yes. Safety Management Consultants." The parties do not dispute that "Safety Management

---

[5]Again, Defendants' response shows disregard for the preservation letters sent by the Plaintiffs, which included warnings that an adverse inference instruction may issue. The Defendants state that Plaintiffs were not interested in the trailer until they were told in a deposition that the trailer had been put back into service. (Def. Brief, 21). The police found no defect in the unit; and, Plaintiffs' experts do not suggest that the trailer had anything to do with the accident. *Id.* Defendants also claim that they will raise no defense based on brake failure. *Id.* However, the Plaintiffs' preservation letters to Defendants specific to the tractor-trailer unit put Defendants on notice that litigation was imminent and relevant evidence required preservation. *Cache La Poudre Feeds, LLC v. Land O'Lakes Farmland Feed, LLC*, 244 F.R.D. 614 (D. Colo. Mar. 2, 2007) (citation omitted). After receipt of that letter, the Defendants were required to preserve the trailer in its condition as it existed at the time of the accident. Given the uncertainty that exists after a fatal accident, the trailer of a semi-truck required preservation, absent court intervention. GLS does not even attempt to show that it tried to preserve the trailer.

5

Consultants" is really Central Transport and is not a separate entity. (Doc. 272, 17). The Defendants misled Plaintiffs by referring to Safety Management Consultants, really a unit of Central Transport which provided safety services to Pro Logistics. In a supplemental response, Central Transport identified its safety director as Randall Fields, instead of Kirk Cummings. Fields had retired prior to June 1, 2006, the date of the collision. *Id*. at 26.

As a final example, on July 16, 2007, Plaintiffs deposed Charles Bock, the group operations manager for Central Transport. Bock reported to the accident scene and took photographs and notes about the tractor-trailer and the driver, Albright. Bock placed his notes in an envelope and sent those notes to Tara Murphy in Central Transport's Safety Department on June 2, 2006. (Bock Dep., 23). Bock's handwritten notes are now missing. Bock also typed his notes which the Defendants did not produce until the day of Bock's deposition, a year after the collision. (Bock Dep., 10). Bock's typed notes refer to potential braking failure and that Albright was on morphine. *Id.* at 33, 36, 80. Central Transport did not ask Bock to obtain these notes and photographs until two weeks before his deposition and did not produce them until the day of the deposition. *Id.* at 59.[6] While

---

[6]The Court is unpersuaded by Defendants' responses that, in essence, 1) the handwritten notes would not be of any use to the Plaintiffs, and 2) they would have been protected by attorney work-product anyway. The Federal Rules of Civil Procedure do not entitle Defendants to determine what the Plaintiffs will and will not need in terms of clearly relevant evidence. *See United States ex rel. Schwartz v. TRW, Inc.,* 211 F.R.D. 388, 392 (C.D. Cal. 2002). Furthermore, the Court need not analyze whether Bock's and Murphy's notes are protected by the attorney work-product privilege because the Court will only determine privilege after Defendants present Plaintiffs a privilege log so that Plaintiffs may have the opportunity to challenge the basis of the privilege asserted. *See Dorf & Stanton Communs. v. Molson Breweries,* 100 F.3d 919, 923 (Fed. Cir. 1996). In addition, if the materials were gathered as part of a routine accident investigation, then they are not covered by the work product privilege. It appears this investigation was done

6

these abuses caused relatively minor prejudice, the following abuses have substantially

interfered with the litigation.

### D. Major Discovery Abuses

#### 1. Albright's Logbooks

Federal regulations require semi-truck drivers to record activity and duty status.

49 C.F.R. § 395.8(k). Drivers must keep these records, known as logbooks, for at least

six months. *Id.* Consistent with these regulations, Pro Logistics requires drivers to

complete daily logs and submit underlying carbon copies to their offices, while the driver

keeps the originals. (Doc. 307, 5). Pro Logistics then forwards the carbon copies to

Central Transport which scans the copies and keeps them for six months. *Id.* Pro

Logistics does not keep the copies it forwards to Central Transport. *Id.*[7]

On June 19, 2006, eighteen days after the accident, Plaintiffs sent Central

Transport a certified preservation letter requesting that certain documents, including

records related to Albright's driving, be preserved for Plaintiffs' investigation. (Pl. Brief

Ex. A-4). The preservation letter was specific as to the evidence requested and put

Central Transport on notice of impending litigation. Plaintiffs sent interrogatories and

document requests for Albright's logbooks on December 27, 2006. (Pl. Ex. C-2, D-2).

After receiving two extensions to respond, Central Transport simply stated that it was

___

pursuant to company policy and not only in anticipation of litigation.

[7]While this sequence of events is easily stated, it took months to learn this information
from the Defendants through discovery.

Case 2:06-cv-04137-NKL   Document 567   Filed 03/06/08   Page 7 of 21

"not in possession of responsive documents as Central Transport, Inc., has no connection to the accident giving rise to this litigation." (Pl. Ex. G). Thus, Central Transport effectively represented that it was not in possession of any diary or logbook kept by George Albright. (Pl. Ex. G-2 No. 8). It also created the impression that the only photos it had of the accident were obtained from the Missouri Highway Patrol. However, it is now clear that Charles Bock, the Group Operations Manager of Central Transport, took pictures immediately after the accident.

Pro Logistics also requested additional time to respond, which the Court granted. (Doc. 67). When Pro Logistics finally responded, it did so with boilerplate objections that were without colorable merit. (Pl. Brief Ex. F, G, J). On March 7, 2007, Plaintiffs sent counsel for Pro Logistics a "golden rule" letter. (Pl. Brief Ex. I). On April 5, 2007, the Court held a teleconference to discuss the progress of discovery. (Doc. 112). Because the Defendants had not submitted responses to all of Plaintiffs' December discovery requests, the Court ordered Defendants to do so within seven days or pay for a special master. *Id*. On April 13, 2007, Pro Logistics responded that it did have possession of Albright's logbooks and produced "them," missing 22 days in April, May and June, including the day before and the day of the collision. (Doc. 272, 6).[8] Pro Logistics' corporate representative, Joseph Golec, could not explain the missing pages. (Golec Dep., 116-17). Pro Logistics now explains in its brief, without supporting

---

[8]It has now been determined that Pro Logistics only produced "copies" of the logbook, not the original.

affidavits, that most of the missing dates are dates on which Albright was off-duty. (Doc. 307, 8). However, in his deposition, Golec acknowledged that Albright could not have been off on June 1, because that was the day of the accident.

On May 2, 2007, the day after Golec's deposition, Central Transport's corporate representative, Thomas Christ, testified that Central Transport provided safety services to Pro Logistics including driver verification, logbook auditing and drug and alcohol testing. (Chris Dep., 17-19). He further testified that Central Transport assembled a file which contained documents concerning the accident but did not keep copies of the files. (Christ Dep., 26, 29, 31, 33). According to Christ, all the documents in the accident file had been given to Pro Logistics. He specifically denied under oath that Central Transport had any documents related to the accident. (Christ Dep., 42-44, 64).

On June 27, 2007, after being told that none of the Defendants had produced the original logbooks, the Court ordered that all parties including their affiliates and subsidiaries produce the missing documents by July 12, 2007, or explain why they could not be produced and what efforts had been made to locate the missing documents. (Doc. 193). In response, Pro Logistics represented that it was the only entity to have possessed the logbooks, and represented that it had produced the logbooks on April 13, 2007, with all pages in its possession. (Pl. Ex. Q ¶ 4). Pro Logistics also represented that Albright had not turned in entries for significant periods in April and May and his logbook which contained entries for May 31, 2007 and June 1, 2007, was no longer in the cab of the vehicle after Albright was taken from the scene of the collision. (Pl. Brief Ex. Q ¶ 8).

9

On July 11, 2007, Central Transport, in response to the Court's order of June 27, 2007, stated that Albright's logbooks could not be produced because "they were not and are not" in Central Transport's possession. Central Transport further notified the Court that it had discovered some data related to logbook audit for Albright and had disclosed the information to Plaintiffs. (Doc. 208).

On August 8, 2007, as a result of Plaintiffs' request to examine Albright's original logbook, Plaintiffs deposed Central Transport's Vice-President of Industrial Relations, Safety and Security, Kirk Cummings. He testified that Central Transport did accident investigations and logbook editing for Pro Logistics. (Cummings Dep., 67). Cummings further testified that Central Transport had kept Albright's original logbooks in Central Transport's accident file and that the logbooks and file were now missing. *Id.* at 56, 58, 76-77.[9] This is the first time Central Transport directly notified Plaintiffs that the original logbook was missing. Cummings explained that Central Transport was in possession of the accident file six weeks to one month prior to July 11, 2007, the date when Cummings submitted his affidavit stating that he had done a search of Central Transport files and could not find the logbook. *Id.* at 80-81, 89-90. Cummings's testimony is in direct conflict with Christ's testimony on May 2, 2007, and Plaintiffs offer it as evidence that Central Transport deliberately misled Plaintiffs and violated the Court's order of April 5,

---

[9]The Defendants dispute that Cummings said the original logbook was in the accident file, but the Court finds this to be the fair inference from his testimony.

10

2007. Meanwhile, Albright's original logbooks have vanished and there appears no way to retrieve them.[10]

The record establishes that Central Transport possessed Albright's logbooks after April 5, 2007, when the Court ordered the Defendants to respond to Plaintiffs' discovery requests and at which point Central Transport's responses were false. In addition, Central Transport's representative, Thomas Christ, intentionally misled the Plaintiffs and the Court when he testified in May 2007 that Central Transport did not have possession of the accident file which contained the logbook. However, Central Transport falsely stated in its Notice of Compliance in response to the Court's order of June 27, 2007, that the logbooks "were not and are not" in Central Transport's possession. (Doc. 208 ¶ 1).

Central Transport clearly made identifiable efforts to avoid compliance with the orders of this Court and the rules of discovery. *Chrysler Corp.*, 186 F.3d at 1021. Due to the frequent misleading or deceptive conduct by Central Transport throughout this litigation, the Court does not believe Central Transport's lawyer's assertion that Christ was merely mistaken when he said Central Transport did not keep a copy of the accident file. (Doc. 308, 4, 14) (citing Christ Dep, 32). The disappearance of the accident file lends further support to the Court's conclusion that Central Transport willfully

---

[10]While Plaintiffs appear to have reliable photocopies of the original logbook for the day of the accident and the day before the accident, they only have "copies" of the rest of the logbook. Given the history of the Defendants' conduct, it is impossible to determine on the record before the Court whether the "copies" produced by the Defendants accurately reflect the original logbook. Plaintiffs were prejudiced by not being able to verify the accuracy of the copies. *See Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1443 (11th Cir. 1985).

11

disregarded the Court's order and materially and repeatedly interfered with Plaintiffs' discovery.

The Court finds that it is more probable than not that the original logbooks were in the accident file in the possession of Central Transport when the Court ordered the logbooks produced and Central Transport intentionally did not produce the logbooks. Previously, Central Transport had stalled answering interrogatories about the logbooks, and only did so after the Court's April 5, 2007 order, months after the first discovery request was made. Even then, it gave a false answer. Because the logbook disappeared from Central Transport's possession after it was ordered to be produced by the Court and no credible explanation has been given as to what happened to the logbook after it was in the possession of Central Transport, and in light of other misleading statements made by Central Transport, the Court finds the logbook was destroyed either with the knowledge of Central Transport or at the direction of Central Transport.

The Court also finds that Plaintiffs have been prejudiced by the loss of the logbook. Central Transport has not convinced the Court that copies of Albright's drivers' logs are sufficient replacements given the suspicions raised by Central Transport's conduct.

### 2. The Accident File

On December 27, 2006, Plaintiffs served written discovery requesting "accident files maintained by [your company] for the crash of June 1, 2006 . . . ." (Pl. Ex. D). After issuing boilerplate objections, Central Transport responded to Plaintiffs' request stating

12

"none."  (Pl. Ex. G).  Central Transport in fact kept two accident files - one by the "accident determination specialist" and a more detailed file kept by Tara Murphy, Central Transport's safety director.  (Murphy Dep. 6, 73-74).  The first file would have included a road service report, the police report and the driver's handwritten report.  *Id.* at 75.  The second file would have included the driver logbooks, the driver qualification file, the dispatch information, maintenance records on the equipment, any communications related to it, photos, the medical long form, business cards, notes, the police report, and anything else received during the course of an investigation.  *Id.* at 72-73.  The file existed when Murphy left employment with Central Transport in April 2007.  *Id.*  According to Central Transport, it "lost" its accident file when its Safety Department moved locations.  (Doc. 308, 12).  Again, Thomas Christ, Central Transport's vice-president, testified that Central Transport had turned over to Pro Logistics all of its files related to Albright's collision when Central Transport's assembly of the accident file was finished.  (Christ Dep., 43).  He further testified that Central Transport did not keep copies of the files (Christ Dep., 44).  As with Albright's logbooks, deposition testimony shows that Central Transport possessed the accident file at least until June 2007, contrary to what Mr. Christ represented on May 2, 2007, on behalf of Central Transport.  (Cummings Dep., 80-81, 89-90).

Given the course of bad faith conduct by Central Transport, the Court is unconvinced that the accident file is merely a compilation of documents stored elsewhere on company computers in the normal course of business, or that much of the contents had

already been produced to plaintiffs before the file was lost.   (Def. Brief, 1).  Nor is the

Court convinced that Plaintiffs have "almost" all the material from the file and have

therefore suffered no prejudice.[11]  Had any of the events occurred in isolation, the Court

would be more willing to accept Central Transport's claims of innocence and no

prejudice.  But they did not occur in isolation.  Central Transport has intentionally and

repeatedly made it difficult for the Court and the Plaintiffs to learn the most basic

information about this accident even after being given extensions to respond and even

after one spoliation penalty was assessed.

### 3.    Logbook Audits

Plaintiffs' Interrogatory No. 16 requested the Defendants to state whether their

company contracted with another company to perform logbook audits of its drivers.  If so,

to provide the contact information for that company.  (Doc. 272, 13).  Central Transport

objected on the ground that "Mr. Albright was not an employee driving under Central

Transport, Inc.'s authority at any time material."  (Pl. Ex. G).  Interrogatory No. 15

requested the companies to provide a copy of their policy regarding auditing their drivers'

logbooks.  Central Transport again objected, saying that Albright was not driving under

its authority and further objected that the request violated its privacy/trade secrets.  (Pl.

_____

[11]The Court has permitted the examination of Central Transport's computer files to
identify any information that might be relevant to the missing accident file.  While this permitted
Plaintiffs to verify whether there is additional evidence that has been withheld, it cannot be a
substitute for original records that admittedly existed when the discovery requests were made.
There is also no affirmative, technical evidence in front of the Court to show that Central
Transport files accurately reflect the original accident documents.  Because discovery is now
closed, the Court denies Central Transport's Motion to Reconsider [Doc. 398, 399].

14

Brief, 14). It was later learned that Central Transport provided Pro Logistics with logbook auditing services for Albright. (Murphy Dep., 21-22). Central Transport did not disclose that it did Albright's logbook audits until its Notice of Compliance filed July 11, 2007, more than six months after Plaintiffs' initial request.[12] Even then, Central Transport produced only one logbook audit report.

As with Albright's original logbooks and Central Transport's accident file, Central Transport attempts to minimize the importance of its delayed production. Central Transport responds that all of the logbook audit data regarding Albright have been produced to plaintiffs. (Def. Ex. 15). Central Transport admits that individual audit letters are missing, although it suggests that those letters are of minor importance.[13] However, the confusion alone caused by Central Transport's discovery abuses warrants sanctioning and undermines the force of Central Transport's argument that this is much ado about nothing.

### 4. Satellite Tracking Data

Included within Plaintiffs' original preservation letters sent after the collision were requests to preserve "any on board recording device, satellite data, computer data,

---

[12]In his deposition, Christ affirmed that Central Transport had not done any of Albright's "driver verification." (Christ Dep., 25).

[13]Defendants state that those letters would have been sent to Albright directly if any violation had been found. (Def. Brief, 16). Defendants assert that this is not relevant because Albright's failure to sign and return the letters would not have a causal link to the collision. *Id.* Murphy testified that it is usual for drivers not to return letters, and additional follow up is made if there are "continuing violations." (Murphy Dep. 21-22).

15

communications records, tracking device information, etc." (Pl. Ex. A). Interrogatories served on December 27, 2006, requested that Defendants state whether there was a satellite tracking device, its make and model, and how the data in the device was retrieved. (Interrogatories 19-20). Central Transport repeated its general objection that it did not hire Albright, own or operate the tractor-trailer involved. Pro Logistics and GLS denied having information relevant to the interrogatories. On May 1, 2007, Pro Logistics' corporate representative, Joseph Golec, denied under oath the existence of such a device in the truck. (Golec Dep., 82). On June 11, 2007, Plaintiffs' expert discovered a satellite tracking device in the truck during his inspection. (Pl. Ex. X). Plaintiffs further allege that the device had been tampered with prior to the inspection - cable connecting clips and adhesive had been removed and metal screws that held a protective cover over the device were loose. (Doc. 272, 21). On June 27, 2007, this Court ordered Pro Logistics to provide information related to the device by July 4, 2007. On July 11, 2007, this Court again found Defendants' answers insufficient and granted Plaintiffs a spoliation instruction as to Pro Logistics, LIC, LSI and GLS. (Doc. 219).

Again the Court is requested to believe that Golec, Defendants' deponent, in this case, was simply mistaken. Pro Logistics claims that the device was not working and that explains why Golec might conclude that the truck had no tracking device. (Doc. 307, 4). Pro Logistics and GLS also argue that Albright's trip was not long enough to generate useful data. (Def. Brief, 18). These explanations do not excuse untrue or misleading answers to Plaintiffs' Interrogatory 19. (Doc. 307, 18). Parties are under an obligation to

investigate to determine whether they have possession of information requested. Golec has not testified that he conducted a physical investigation which, of course, would have shown there was a satellite system.

### E.    Determination of Sanction

The Plaintiffs have suffered clear prejudice as a result of Central Transport's and Pro Logistics' abuse of the discovery process. Central Transport had both Albright's original logbooks and two accident files, and the Court has reasonable doubts as to the accuracy of the proffered duplicates. Pro Logistics wrongfully denied the existence of a satellite tracking device when one existed and that information was readily obtainable by Pro Logistics. The data, if any, is now lost because the device was not preserved in its original condition. It also misled Plaintiffs as to Central Transport's role in auditing logbooks. The Plaintiffs simply cannot know at this point what beneficial evidence may have been available if discovery had been provided as required by the Federal Rules of Civil Procedure. Because the record shows that Central Transport willfully violated a discovery order of this Court and Pro Logistics willfully impeded the discovery process, sanctions are appropriate.

The Court has considered the following alternative sanctions authorized under Eighth Circuit law: striking pleadings, adverse inference jury instruction; monetary sanctions; and, costs related to retrieving or reconstructing destroyed documents.

### 1.    Central Transport

The Court finds that Central Transport is liable for sanctions under Rule 37(b) and under the Court's inherent authority to regulate this litigation. Central Transport willfully violated the Court's orders and the Plaintiffs have suffered significant prejudice as a result: they cannot know what evidence might have been contained in Albright's original logbooks or Central Transport's accident file. This evidence was obviously responsive to requests made by the Plaintiffs early in discovery and was required to be produced. Central Transport has been cavalier in its approach to discovery throughout this litigation and has intentionally confused and misled the Court and the Plaintiffs. In twelve years on the bench, the Court has seen only one other case with similar discovery abuses and in that case the Court struck the offending party's pleadings. The Court concludes that a similar sanction is appropriate here. The Court has considered a lesser sanction such as an adverse inference instruction or payment of fees and costs associated with the discovery abuses. However, the Court has already imposed one adverse instruction in the case and adding two more is not sufficient, even though the practical effect might be the same as striking Central Transport's pleadings. Payment of fees associated with discovery abuses seems more appropriate when evidence is eventually produced after a party has delayed or confused the discovery process without just cause but has not actually destroyed evidence after being ordered by the Court to produce it. In this case, Central Transport lied to the Court and some of the evidence about which it lied has now disappeared under undocumented circumstances that warrant a finding of intentional

18

destruction. As punishment, Central Transport's pleadings are stricken and a default judgment is entered against Central Transport.

### 2. Pro Logistics

Federal Rule of Civil Procedure 26(g) imposes on each party and their counsel a duty to responsibly engage in pretrial discovery. Rule 26(g)(3) provides, in pertinent part, that appropriate sanctions shall be imposed by the court either on its own motion or on the motion of a party, "[i]f without substantial justification a certification is made in violation" of Rule 26(g). Defendants Pro Logistics' failure to comply with the requirements of Rule 26(g) provides an alternative basis for imposing sanctions. *See Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 19 F.3d 431 (8th Cir. 1994) (affirming sanctions on the basis of Rule 26(g) for failure to make certain pretrial admissions). Plaintiffs incurred legal expenses in connection with the pending motion that would not have been required had Pro Logistics and its counsel undertaken a reasonable investigation to identify and preserve relevant materials, and then taken affirmative and effective steps to monitor compliance with discovery obligations. Pro Logistics not only represented that it was the only entity in possession of Albright's logbooks, but turned them in with missing entries without investigating why the entries were missing or telling the Plaintiffs and the Court that the original logbooks were missing. In addition, Pro Logistics gave false responses to Plaintiffs' Interrogatory No. 19 inquiring as to satellite tracking data. Finally Pro Logistics provided misleading information when it said that Safety Management Consultants provided logbook audits for Pro Logistics, knowing that

19

Safety Management Consultants was Central Transport, not a separate entity. While these abuses substantially protracted the discovery process, the Court believes that a monetary sanction is appropriate because the abuses are not as severe as those committed by Central Transport. Therefore, Pro Logistics is ordered to pay Plaintiffs $30,000, which the Court finds is a sufficient deterrent to future abuse and will compensate for some of the time spent by Plaintiffs' attorneys to find the satellite tracking device and to identify Central Transport's role in auditing and possessing Albright's logbooks. Had Pro Logistics been more forthcoming in its discovery responses, evidence might have been discovered before it was destroyed.

As for GLS, the trailer unit involved in the accident should have been preserved after Plaintiffs sent GLS a timely and specific preservation letter. Also, GLS should have exercised more care to determine the existence of the satellite tracking device. However, because the Court has under advisement GLS's Motion to Reconsider the Court's spoliation instruction, it will deny without prejudice Plaintiffs' request for a sanction against GLS. Instead, the Court will address the issue of sanctions at the time it reconsiders the spoliation issue.

Accordingly, it is hereby

ORDERED that Plaintiffs' Motion for Sanctions [Doc. # 272] is GRANTED as to Defendants Central Transport, Inc., and Pro Logistics, and DENIED as to George Albright, Jr., Logistics Insights Corporation, Logistics Services, Inc., and GLS LeaseCo, Inc. Defendants' Motion to Strike Plaintiffs' Motion for Sanctions [Doc. # 400] is

20

DENIED.  The pleadings of Central Transport, Inc., are stricken and a default judgment is

entered against Central Transport, Inc.  Pro Logistics is ordered to pay Plaintiffs $30,000.

Central Transport's Motions to Reconsider [Docs. ## 398, 399] are DENIED as moot.


                                        s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge

Dated:  March 6, 2008
Jefferson City, Missouri