IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| JAMES GARRETT, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 06-CV-4137-NKL |
| ) | (Consolidated with Case Nos. 06-CV- |
| GEORGE MARTIN ALBRIGHT, JR., et al.,) | 0785, 06-CV-4139, 06-CV-4209 and 06- |
| ) | CV-4237) |
| Defendants. ) | |

**ORDER**

This case involves four lawsuits that arose from a June 1, 2006, automotive accident on Interstate 70 in which four people died and several others were injured.[1] The defendants are George Martin Albright, Jr. ("Albright"); Trucker's Plus HR, Inc.; GLS LeasCo Corporation ("GLS LeasCo"); Logistics Insight Corporation ("Logistics Insight"); CenTra, Inc. ("CenTra"); and Pro Logistics, Inc. ("Pro Logistics").[2]

Pending before the Court is GLS LeasCo's, Logistics Insight's and Pro Logistics' Motion for Summary Judgment [Doc. # 485] as to Plaintiffs' claim that Albright was impaired within the meaning of 49 C.F.R. § 392.3. For the reasons stated herein, Defendants' Motion is DENIED.

**I. Background**

---

[1] On January 8, 2008, this Court dismissed Case No. 06-4237-CV-W-NKL, pursuant to Fed. R. Civ. P. 41(a)(2).

[2] On March 6, 2008, the Court entered default judgment against Central Transport, Inc., and granted summary judgment to Logistics Services, Inc. (Docs. ## 567, 571). On March 11, 2006, the Court granted summary judgment to Resolve Staffing, Inc. (Doc. # 587).

1

On June 1, 2006, George Albright, Jr., was driving the tractor-trailer that caused the accident that is the subject of this case. On that date, Albright was an employee of Trucker's Plus and was working as a commercial driver for Pro Logistics driving a unit owned by GLS LeasCo. (Fuston Dep., 6, 49). Plaintiffs allege that Albright was driving while impaired within the meaning of 49 C.F.R. § 392.3, and Defendants are not only vicariously liable but breached various duties to prevent an unsafe driver, Albright, from causing the collision.

> 49 C.F.R. § 392.3 provides:
>
> No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him to begin or continue to operate the commercial motor vehicle. However, in a case of grave emergency where the hazard to occupants of the commercial motor vehicle or other users of the highway would be increased by compliance with this section, the driver may continue to operate the commercial motor vehicle to the nearest place at which that hazard is removed. *Id*.

Plaintiffs have set forth significant evidence supporting their theory that Albright was impaired through all three classifications - "fatigue, illness, or any other cause" - set forth in 49 C.F.R. § 392.3.

### A. Fatigue

Defendants allege that Plaintiffs "have not presented evidence showing Mr. Albright was fatigued at the time of the accident, let alone that fatigue caused the accident." (Doc. 550, 2).[3] Defendants cite in support of their position *Martinez v. CO2*

---

[3]Plaintiffs argue in part that if Defendants had disqualified Albright under the FMCSR, the collision would not have occurred. Thus, Plaintiffs need only show that the Defendants should

*Serv., Inc.*, 12 Fed. Appx. 689 (10th Cir. 2001), which held in part that the plaintiff had raised only the possibility that fatigue caused a tractor-trailer collision.

The purpose of commercial motor vehicle drivers' extensive record-keeping regulations is ensuring that drivers are well-rested and do not present a danger to the motoring public. (Cummings Dep., 61); *see also United States v. Knight*, 306 F.3d 534, 539 (8th Cir. 2002) ("A driver without sufficient rest presents a safety hazard on the highway, and he and his vehicle can be pulled out of service.") (citing 49 C.F.R. § 395.13). Plaintiffs have set forth evidence that Albright frequently violated logbook recording regulations and that Defendants failed to act on or even observe those violations. (Guntharp Dep., 89, 94, 194).[4] Plaintiffs have set forth evidence that on several occasions, Albright failed to turn in logs recording his time. (Safety Management Consultants Logbook Audit, June 2, 2006; Cummings Dep., 58-59). Plaintiffs have also set forth evidence that Albright falsified his logs. On the day of the collision, Albright

---

have disqualified Albright, not necessarily that his fatigue, illness or "other" condition caused the collision. In order to prove causation, a plaintiff must prove that "but for" the breach of duty, the event would not have occurred. *Poloski v. Wal-Mart Stores, Inc.*, 68 S.W.3d 445, 449 (Mo. Ct. App. 2001) ("In other words, if a reasonable jury could conclude that "but for" any one of the six factors, Ms. Poloski would not have been killed, plaintiff has met its burden and the trial court did not err in denying the motions for a directed verdict and a judgment notwithstanding the verdict.") (citing *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862 (Mo. banc 1993)).

[4]Defendants argue that Guntharp's methods for checking Albright's logbooks are flawed because he assumed that dispatch records were correct dispatch times instead of merely scheduled dispatch times. (Zeidan Dep., 37-38) ("That's the appointment time that he's supposed to be there by."). Any weaknesses in Guntharp's methods are to be explored at trial. Plaintiffs have set forth sufficient evidence to justify a trial on whether Albright falsified his logbooks and whether Pro Logistics and Central Transport failed to adequately monitor his recording activities.

3

stated that he "felt rested. [He'd] slept over ten hours." (Albright Dep., 82).[5] Albright's cell phone records reflect calls or other entries at 5:47 a.m., 6:50 a.m., 12:57 p.m., 1:06 p.m., 4:17 p.m. and 4:20 p.m.[6] These entries total 50 minutes of call time during the same period Albright claimed he slept. A witness to the collision stated that Albright looked "like he was falling asleep" immediately before the collision. (Andrew Dep., 15). Employers of commercial motor vehicle drivers must use documents other than drivers' logbooks to check for violations in order to ensure that drivers are not falsifying their hours-of-service. (Guntharp Dep., 155).[7] Plaintiffs have set forth evidence that Pro Logistics and Central Transport failed to properly check Albright's logs. *Id.* Defendants paid Albright notwithstanding a stated policy that failure to turn in logbooks would result in the withholding of pay. (Cox Dep., 46, 95).

In *Martinez*, a tractor-trailer unit crossed two lanes of traffic and struck and killed a New Mexico highway transportation worker. 12 Fed. Appx. at 691. Rescue personnel found the driver dead inside and an autopsy showed that he had died from sudden cardiac arrest. *Id.* Plaintiff asserted that the driver may have fallen asleep before his cardiac arrest, although she admitted that "there is no direct evidence that [the driver] fell asleep."

---

[5] Albright confirmed that he slept from 6:00 a.m. to 4:45 p.m. (Albright Dep., 85).

[6] Albright and other Defendants challenge the interpretation, but not the authenticity of the phone records.

[7] Pro Logistics submits as evidence a DOT audit which gave Pro Logistics a "satisfactory" rating and cited Albright only for failing to complete a vehicle inspection report. (Doc. 553, Ex. PP). Pro Logistics' safety record is relevant evidence as to its knowledge of Albright's violations, but it does not dispose of the issue of whether Albright drove in violation of 47 C.F.R. § 392.3. *See United States v. T.I.M.E.-D.C., Inc.*, 381 F.Supp. 730 n.17 (W.D. Va. 1974).

4

*Id*. at n.9. Here, Plaintiffs have produced witness testimony that Albright was falling asleep at the wheel and that there are substantial weaknesses as to his claim that he slept for ten hours before the collision.[8] A reasonable juror could conclude based on this evidence that Albright was "fatigued" within the meaning of 49 C.F.R. § 392.3 when he collided with Plaintiffs' vehicles.

### B.     Illness

This Court has found no definition for "illness" under the Federal Motor Carrier Safety Regulations nor interpretation thereof in relevant cases. In the absence of a DOT interpretation of the word "illness," the Court looks to the plain meaning of the term. *See Advanta USA, Inc. v. Chao*, 350 F.3d 726, 728 (8th Cir. 2003).[9] Albright had a heart attack and a stroke in 1997. (Albright Dep., 366). Albright suffered his heart attack while driving a commercial motor vehicle. (Albright Dep., 198-99). Between 1997 and 1999, Albright had indications of coronary artery disease and in 2004 there existed a

---

[8]Defendants claim that Plaintiffs cannot use witness testimony taken from Albright's related state court criminal proceeding stating that Fed. R. Civ. P. 56 "specifically defines the materials the Court may consider in passing on summary judgment." The Court assumes Defendants are claiming that 1) the supporting materials listed in Fed. R. Civ. P. 56 are exhaustive and exclusive, or 2) the testimony would be inadmissible at trial. Fed. R. Civ. P. 56(c) permits consideration of the "discovery and disclosure materials on file" of which Andrew's testimony is part. *King v. Hardesty*, 2008 U.S. App. LEXIS 4384 (8th Cir. 2008). The Court will not speculate as to any admissibility deficiencies in Plaintiffs' use of Andrew's testimony.

[9]Indeed, it is logical and consistent with the safety purpose of the FMCSR that a liberal definition of "illness" be adopted. *See United States v. T.I.M.E.-D.C., Inc.*, 381 F.Supp. 730, 736 (W.D. Va. 1974) (finding in part that an inner ear infection was an "illness" within the meaning of 47 C.F.R. § 392.3).

5

notation stating that Albright needed a DOT stress test on the basis of his cardiac history. (Guntharp Dep., 240).

> Nowhere in any [of Albright's medical records] is there anything that says that this coronary artery disease has been addressed or resolved. So, you know, until you get that from the doctor, until you get a statement from the doctor that says that the driver has no clinical diagnosis of coronary . . . arterial disease that can affect his driving, until that time this would take precedence." *Id*.

Plaintiffs have set forth evidence that Defendants failed to follow industry practices for preventing drivers with continuing cardiac impairments from driving. (Guntharp Dep., 240-41). This includes a motor carrier's obligation to contact Albright's physician when it learns that a driver has a history of cardiac disease or stroke. (Guntharp Report, 8). Albright was diagnosed with non-insulin dependent diabetes in 1997. (Albright Dep., 366). As a result of these conditions, Albright's physician qualified him for one year only, whereas healthy drivers are generally qualified for two. A qualification for one year only is a "red flag" for a medical condition that requires continuous monitoring. (Cox Dep., 124). According to Plaintiffs, Pro Logistics was under an obligation under general industry practice to follow up on Albright's medical conditions when they observed he was qualified for only one year.[10] (Guntharp Dep., 139). A reasonable juror could conclude that Albright was likely to become impaired through one of his illnesses as to make him an unsafe driver within the meaning of 49 C.F.R. § 392.3.

**C.     Other**

---

[10]Albright does not think he informed Pro Logistics of his heart attack. (Albright Dep., 198-99).

6

At the time he was hired and as of the day of the collision, Albright was "taking a large number of prescription drugs" which he failed to list on his medical long form. (Albright Dep., 197). On the day of the collision, Albright admits to taking diazepam (Valium), the use of which is prohibited by motor carrier safety regulations unless a medically licensed practitioner advises the driver that the medication will not adversely affect his or her ability to safely operate a commercial motor vehicle. FMCSR § 391.41(b)(12)(ii)(B). The issue of diazepam's causation in this collision has been disputed by the parties and is a primary issue in Defendants' motion. Albright admitted that he "sometimes" takes diazepam while driving. (Albright Dep., 222-23). Albright quickly qualified his statement saying that he "never" took diazepam and drove, but could not reconcile conflicting record evidence that he took diazepam at 4:00 a.m. and made a cell phone call at 5:47 a.m. when he also claimed he was driving. *Id.*[11] Plaintiffs have also set forth evidence that Defendants' medical expert, Charles Reskin, states that no one should take diazepam and drive because it causes drowsiness. (Reskin Dep., 64, 155). Diazepam has a half-life of 20 to 80 hours. (Reskin Dep., 63, 67). Although Albright's post-accident drug screen did not show detectable levels of diazepam, the dosage prescribed to Albright could be below detectable limits. (Long Dep., 83-84). The only medical conclusions submitted, by Reskin and Defendants' expert, Christopher Long, state that diazepam played no role in the collision. Albright testified that he told Pro

---

[11]Albright has supplemented his answers stating that he no longer can recall taking diazepam the morning of June 1, 2006. That Albright cannot recall taking diazepam over eighteen months after the collision does not directly conflict his earlier testimony that he took it at 4:00 a.m.

Logistics "everything" about his medications.[12] (Albright Dep., 297). Under common practice, when Pro Logistics noticed that Albright did not list his medications, the person reviewing the medical form would "most likely call" the driver's physician and ask them about their medications. (Guntharp Dep., 41).

Based on the medical testimony, the Court concludes that no reasonable juror could find that Albright's ingestion of diazepam at 4:00 a.m. caused the collision. However, Albright's use of diazepam is relevant not only to "aggravating circumstances" the Plaintiffs intend on submitting under Missouri's wrongful death statute, but also under 49 C.F.R. § 392.3. That regulation requires only that a driver may not operate a commercial motor vehicle where he is likely to become impaired for "fatigue, illness or other" reason. *Id.* Whether Albright drove his tractor-trailer unit soon after taking diazepam is relevant. Indeed, the Third Circuit has suggested that drug treatment need only be "conducive to fatigue and drowsiness" in order to disqualify a driver under 47 C.F.R. § 392.3. *Coleman v. Keystone Freight Corp.*, 142 Fed. Appx. 83 , 85-86 (3d Cir. 2005). The Defendants may, therefore, be entitled to a limiting instruction as to diazepam's causative role in the collision, but they are not entitled to total exclusion of the evidence nor are they entitled to a grant of summary judgment where Plaintiffs have

---

[12]Albright certainly did not testify that he informed Trucker's Plus and Pro Logistics of "every medication" or "diazepam." But, because the Court must draw all inferences in favor of the non-moving party, it must, for purposes of summary judgment, infer that Pro Logistics had knowledge of his medications and medical history as a result of Albright's statements.

8

set forth substantial evidence as to Albright's fatigue and illness under 49 C.F.R. § 392.3.[13]

## II. Conclusion

Accordingly, it is hereby

ORDERED that Defendants' Motion for Summary Judgment [Doc. # 485] is DENIED.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: March 21, 2008  
Jefferson City, Missouri

---

[13]The Court has already determined that Plaintiffs' expert, Walter Guntharp, Jr., may not testify that Albright was "under the influence" of prescription medications at the time of the collision.