**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | |
|---|---|
| JAMES GARRETT, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 06-CV-4137-NKL |
| ) | (Consolidated with Case Nos. 06-CV- |
| GEORGE MARTIN ALBRIGHT, JR., et al.,) | 0785, 06-CV-4139, 06-CV-4209 and 06- |
| ) | CV-4237) |
| Defendants. ) | |

**ORDER**

This case involves four lawsuits that arose from a June 1, 2006, automotive

accident on Interstate 70 in which four people died and others were injured.[1]  The

defendants are George Martin Albright, Jr. ("Albright"); Trucker's Plus HR, Inc.; GLS

LeaseCo Corporation ("GLS LeaseCo"); Logistics Insight Corporation ("Logistics

Insight"); CenTra, Inc. ("CenTra"); and Pro Logistics, Inc. ("Pro Logistics").[2]

Pending before the Court is GLS LeasCo's, Logistics Insight's and Pro Logistics'

Motion for Summary Judgment on Plaintiffs' claims for negligent hiring, supervision,

retention, training and entrustment [Doc. # 489].  For the reasons stated herein, Pro

Logistics' and Logistics Insight's Motion is DENIED and the Court defers ruling on GLS

LeasCo's motion until after oral argument scheduled for March 24, 2008.

---

[1]On January 8, 2008, this Court dismissed Case No. 06-4237-CV-W-NKL pursuant to Fed. R.
Civ. P. 41(a)(2).

[2]On March 6, 2008, the Court entered default judgment against Central Transport, Inc., and
granted summary judgment to Logistics Services, Inc.  (Docs. ## 567, 571).  On March 11, 2006,
the Court granted summary judgment to Resolve Staffing, Inc.  (Doc. #587).

1

## I.    Background

On June 1, 2006, George Albright, Jr., was driving the tractor-trailer that caused the accident that is the subject of this case.  On that date, Albright was an employee of Trucker's Plus and was working as a commercial driver for Pro Logistics.  (Fuston Dep., 6, 49).  The parties dispute whether Pro Logistics and Logistics Insight knew or should have known that Albright presented a foreseeable danger to the motoring public.  In addition, Plaintiffs allege that Pro Logistics and Logistics Insight negligently hired, entrusted, retained, supervised and trained Albright.

Trucker's Plus is a driver staffing company which leases drivers to other companies.  (Fuston Dep., 13).  On September 21, 2005, Trucker's Plus and Pro Logistics entered into a Leasing Services Agreement ("Agreement") which provided that Trucker's Plus would act as Pro Logistics' agent for "the sole purpose of providing [qualified] drivers" to Pro Logistics.  (Agreement, 1).  The Agreement provided that Trucker's Plus was responsible for workmen's compensation liabilities while Pro Logistics was responsible for "all other" liabilities.  *Id.*  The Agreement provided that Trucker's Plus "assumed no responsibility" for the driver's failure to comply with hours of service or other safety regulations "while under dispatch" of Pro Logistics.  (Agreement ¶ 3).  Pro Logistics does its own independent qualifications of a leased driver through safety services provided by Central Transport.  (Cox. Dep., 101; Murphy Dep., 99).  On the day of the collision, Albright drove under Pro Logistics DOT authority and Pro Logistics was responsible for monitoring Albright's logbooks.  (Kelley Dep., 24, 106).  Notwithstanding

2

the Agreement, Pro Logistics' Vice-President of Operations, Joseph Golec, stated that Pro Logistics had no power to discipline Albright for logbook violations. (Golec Dep., 9-10, 144-45).[3]

Pro Logistics considered Albright well-qualified, in part, because he "was an experienced truck driver with a good driving record." (Albright Dep., 11; Guntharp Dep., 234). At the time of the accident, Albright had no disqualifying offenses on his Motor Vehicles Record under FMCSR 391.15. (Morgan Dep., 206-07). As far as safety and training, Pro Logistics generated and transmitted safety bulletins to its drivers and required drivers to pass a road test before driving under their authority. (Murphy Dep., 29). The Federal Motor Carrier Safety Regulations do not require motor carriers like Pro Logistics to obtain Albright's "medical long form" which licensed medical examiners use when examining drivers for qualification. (Gunther Dep., 241).[4] It is nevertheless a motor carrier's duty to make sure that a licensed medical examiner is aware of DOT requirements in qualifying a driver. (Morgan Dep., 110). Pro Logistics argues, in essence, that it fully complied with the requirements of the FMCSR and therefore there is no evidence that it was negligent for failing to exceed the requirements of the FMCSR.

_____

[3]Angel stated that if the customer made Trucker's Plus aware of a violation, the remedies would be as follows: 1) the customer could request removal of the driver with a Trucker's Plus replacement and 2) Trucker's Plus would handle the discipline of the driver. (Angel Dep., 44-45).

[4]The medical "long form" is a Department of Transportation ("DOT") form used by the medical examiner in the driver qualification process. If the driver passes the physical examination in which the long form is used, he or she is issued a medical certificate. The Federal Motor Carrier Safety Regulations require only that motor carriers and drivers obtain and keep the medical certificate approved by a qualified health care professional. *See* 49 C.F.R. § 391.43(g).

(Doc. 490, 25). Moreover, because Albright's physician provided a written release more than a year after the collision, Plaintiffs cannot claim that he was medically unqualified under the FMCSR.

Logistics Insight's deposition witnesses provided varying accounts as to the company's purpose and activities. (Doc. 571, 3-4). Regardless of Logistics Insight's corporate activities, it is undisputed that Larry Cox ("Cox"), Logistics Insight's Director of Trucking Operations, negotiated and accepted the Agreement in which Pro Logistics obtained Albright's driving services from Trucker's Plus. (Cox Dep., 19-21). Cox also testified that he "make[s] sure that the people in the field have what they need to do their jobs . . . . In other words, they actually make their decisions and do their jobs. If they have a problem, then they come to me." (Cox Dep., 18, 19-21, 97). While Logistics Insight could not directly reprimand Albright for logbook violations, upon discovery of a violation, Logistics Insight would "notify the service and tell [the driver] he's no longer welcome back."[5] (Cox Dep., 46). Cox further admitted that he was responsible for "enforcing and insuring that [a driver] abides by the hours of service guidelines." (Cox Dep., 83).

Plaintiffs have set forth significant evidence supporting their theory that Albright should never have been qualified to drive tractor-trailer units because of his driving and

---

[5]Cox is also the President of OTR Logistics, the Secretary of On Demand Transport and the Manager of Maintenance Insight, LINC (or Logistics Insight's) arm of maintenance. Cox receives a single weekly salary for these positions. (Cox Dep., 37-39). Cox also affirmed that he was Pro Logistics Director of Operations, although his own deposition testimony conflicts on that point. (Cox. Dep., 84).

medical history.[6]  Plaintiffs have also set forth evidence that Pro Logistics and Logistics

Insight negligently retained, supervised and trained Albright.

Albright was convicted for "reckless driving" in his personal automobile in 1990.

(Albright Dep., 323-24).  Albright was cited for speeding in a tractor-trailer in Ohio in

2002.  (Albright Dep., 43).  Under Pro Logistics policy, a driver with a reckless driving

conviction should not be hired.  (Golec Dep., 126).[7]

Albright had a heart attack and a stroke in 1997.  (Albright Dep., 366).  Albright

suffered his heart attack while driving a commercial motor vehicle.  (Albright Dep., 198-

99).  Albright also has high blood pressure.  (Pl. Ex. 10).  Albright was diagnosed with

non-insulin dependent diabetes in 1997.  (Albright Dep., 366).  As a result of these

conditions, Albright's physician qualified him for one year only, whereas healthy drivers

are generally qualified for two.  A qualification for one year only is a "red flag" for a

medical condition that requires continuous monitoring.  (Cox Dep., 124).  According to

Plaintiffs, Pro Logistics was under an obligation under general industry practice to follow

[6]Plaintiffs' complementary theory is that Albright was fatigued.  Albright claims that he did not
talk on his cell phone while driving and "would pull over and stop driving if he felt tired."
(Albright Dep., 304, 457).  On the day of the collision, Albright's cell phone records show that
he made telephone calls totaling 50 minutes over the entire period he claimed he was sleeping.
(Albright Dep., 85).  Albright claimed that he slept between 6:00 a.m. and 4:45 p.m. the day of
the collision.  Albright's cell phone records show calls at 5:47 a.m., 6:50 a.m., 12:57 p.m., 1:06
p.m., 4:17 p.m. and 4:20 p.m.  Defendants challenge Plaintiffs' use of Albright's cell phone
records because they cannot be shown to specify the length and location of Albright's calls.
Defendants do not challenge the authenticity of the records.

[7]Golec gave conflicting testimony as to Pro Logistics' policy.  First, he stated that "[i]f [Pro
Logistics] knew about [a conviction for reckless driving], we would not use the person."
Second, he stated that Pro Logistics may hire a driver with a reckless driving conviction if it was
before the "ten-year look-back period" and "depending on the circumstances."  The court must
draw all inferences in favor of the non-moving party.

up on Albright's medical conditions when they observed he was qualified for only one

year.  (Guntharp Dep., 139).  At the time he was hired and as of the day of the collision,

Albright was "taking a large number of prescription drugs" which he failed to list on his

medical long form.  (Albright Dep., 197).  On the day of the collision, Albright admits to

taking diazepam (Valium), the use of which is prohibited by motor carrier safety

regulations unless a medically licensed practitioner advises the driver that the medication

will not adversely affect his or her ability to safely operate a commercial motor vehicle.

FMCSR § 391.41(b)(12)(ii)(B).[8]  Albright testified that he told Pro Logistics "everything"

about his medications.[9]  (Albright Dep., 297).  Under common practice, when Pro

Logistics noticed that Albright did not list his medications, the person reviewing the

medical form would "most likely call" the driver's physician and ask them about their

medications.  (Guntharp Dep., 41).

---

[8]The issue of diazepam's causation in this collision has been disputed by the parties.  Albright
admitted that he "sometimes" takes diazepam while driving.  (Albright Dep., 222-23).  Albright
quickly qualified his statement saying that he "never" took diazepam and drove, but could not
reconcile conflicting record evidence that he took diazepam at 4:00 a.m. and made a cell phone
call at 5:47 a.m. when he also claimed he was driving. *Id.*  Defendants' medical expert, Charles
Reskin, states that no one should take diazepam and drive because it causes drowsiness.  (Reskin
Dep., 64, 155).  Diazepam has a half-life of 20 to 80 hours.  (Reskin Dep., 63, 67).  Although
Albright's post-accident drug screen did not show detectable levels of diazepam, the dosage
prescribed to Albright could be below detectable limits.  (Long Dep., 83-84).  The only medical
conclusions submitted, by Reskin and Defendants' expert, Christopher Long, state that diazepam
played no role in the collision.

[9]Albright certainly did not testify that he informed Trucker's Plus and Pro Logistics of "every
medication" or "diazepam."  But, because the Court must draw all inferences in favor of the non-
moving party, it must, for purposes of summary judgment, infer that Pro Logistics had
knowledge of his medications and medical history as a result of Albright's statements.

6

Plaintiffs also argue that Pro Logistics failed to adequately train their drivers. (Guntharp Report, 10). Pro Logistics provides only a portion of its employee manual to leased drivers in order to make orientation "as brief as possible." (Kelley Dep., 30-31). Plaintiffs have also set forth evidence that Albright frequently violated logbook recording regulations and that Defendants failed to act on or even observe those violations. (Guntharp Dep., 89, 94, 194).[10] Albright does not remember attending any safety meetings provided by Pro Logistics. (Albright Dep., 300). The Agreement between Trucker's Plus and Pro Logistics required that Pro Logistics provide driver training. (Kelley Dep., 28-29). Pro Logistics makes its training for leased drivers as brief as possible because they are not Pro Logistics' employees. (Kelley Dep., 30-31). Defendants paid Albright notwithstanding a stated policy that failure to turn in logbooks would result in the withholding of pay. (Cox Dep., 46, 95). Employers of commercial motor vehicle drivers must use other documents to check drivers' logbooks in order to ensure that drivers are not falsifying their hours-of-service. (Guntharp Dep., 155).[11] Plaintiffs have set forth evidence that as a general matter, Pro Logistics understood that a

---

[10]Defendants argue that Guntharp's methods for checking Albright's logbooks are flawed because he assumed that dispatch records were accurate. (Zeidan Dep., 37-38) ("That's the appointment time that he's supposed to be there by."). The Court has already ruled that Guntharp's testimony is reliable although it has limited the scope of his testimony based on his expertise. Any other weaknesses in Guntharp's methods are to be explored at trial. Plaintiffs have set forth substantial evidence from which a reasonable juror could conclude that Albright falsified his logbooks and that Pro Logistics and Central Transport failed to adequately monitor his recording activities.

[11]Pro Logistics submits as evidence a DOT audit which gave Pro Logistics a "satisfactory" rating and cited Albright only for failing to complete a vehicle inspection report. (Doc. 553, Ex. PP). Discrepancies in the record are to be explored at trial.

driver should be out of service if the company knows that a driver's logs are missing or the driver is not submitting logs.[12] (Cummings Dep., 56, 60).

## II.    Discussion

Pro Logistics and Logistics Insight have moved for summary judgment on the ground that Plaintiffs have produced no medical testimony that Albright's prescription drug use played a role in the collision and therefore there is no evidence that Albright was medically unqualified under the FMCSR. Assumed in the Defendants' motion is the idea that only the FMCSR is relevant to this claim.

### 1.    Negligent Hiring and Retention

Under Missouri law, a claim for negligent hiring or negligent retention will stand where the plaintiff proves (1) the employer knew or should have known of the employee's dangerous proclivities, and (2) the employer's negligence was the proximate cause of the plaintiff's injuries. *Gibson v. Brewer*, 952 S.W.2d 239, 246 (Mo. 1997); *Gaines v. Monsanto Co.*, 655 S.W.2d 568, 571 (Mo. Ct. App. 1983).

Pro Logistics argues that it is entitled to summary judgment because it hired a competent driver, Albright, who was qualified under the FMCSR. Pro Logistics bases its claim on Dr. Baldwin's letter and affidavit, presented more than a year after the collision, stating that had Albright disclosed his medications, it would not have precluded Albright

---

[12]Kirk Cummings handles all safety functions for Pro Logistics. (Cummings Dep., 56) ( "Do you do all safety – handle all safety functions for Pro Logistics?" "As it relates to – I don't know what they do on their own I guess to answer the question, but I would say it's a fairly accurate statement, yes."). Cummings stated: "If it's brought to my attention that we're missing logs on a certain person, they're not turning them in, I would say that the driver was, you know, out of service until the logs are up to date." (Cummings Dep., 60).

from being medically qualified under the FMCSR. Nonetheless, Pro Logistics' argument fails for two primary reasons. First, the FMCSR requires that drivers secure an advisement as to prescription drugs *before* driving commercial motor vehicles. FMCSR § 391.41(b)(12)(ii)(B) ("A driver may use such a substance or drug, if the substance or drug is prescribed by a licensed medical practitioner who . . . [h]as advised the driver that the prescribed substance or drug *will not* adversely affect the driver's ability to safely operate a commercial motor vehicle.") (emphasis added). That failure itself constitutes a violation even without medical testimony. Second, Plaintiffs have established that even if Pro Logistics complied with the FMCSR, failure to follow industry practices caused Pro Logistics to negligently hire an unsafe driver. *See Pierce v. Platte-Clay Electric Cooperative, Inc.*, 769 S.W.2d 769, 772 (Mo. 1989) ("Evidence of industry standards is generally admissible as proof of whether or not a duty of care was breached.").

While Pro Logistics claims it "verified Mr. Albright had the minimum qualifications," (Doc. 490, 24) Plaintiffs have set forth evidence that Pro Logistics knew or should have known that Albright represented a danger to the motoring public. Albright claims that he told Pro Logistics about his medications and yet he was permitted to drive (Albright Dep., 197-98, 297). Also, Albright had a reckless driving conviction, which should have disqualified him from driving with Pro Logistics. (Golec Dep., 126). Because Pro Logistics retained Central Transport to monitor its drivers' logbook violations, a reasonable juror could find that it knew or should have known that Albright violated hours-of-service limitations in the period immediately before the collision.

9

Given this record, a reasonable juror could conclude, as Plaintiffs argue, that Pro

Logistics negligently hired and/or retained Albright knowing his medical, driving and

hours-of-service history.

So far as Logistics Insight is concerned, Cox negotiated the contract between Pro

Logistics and Truckers HR and has general authority to negotiate contracts on behalf of

Pro Logistics because "it's [Cox's] job as director of truckload operations" for Logistics

Insight.[13]  (Cox Dep., 97).[14]  Cox further "make[s] sure that the people in the field have

what they need to do their jobs . . . . In other words, they actually make their decisions

and do their jobs.  If they have a problem, then they come to me."  (Cox Dep., 18).  Cox

further implied that he had the power to control Albright when he stated that "[i]f

[Albright] didn't have a log along with his paperwork, he wouldn't get paid."  (Cox Dep.,

46).  While Logistics Insight could not directly reprimand Albright for logbook

violations, Cox would "notify the service and tell him he's no longer welcome back."

(Cox Dep., 46).  There is no evidence Pro Logistics or Logistics Insight ever notified

_____

[13]In his deposition, Cox stated that he had authority to sign a lease agreement on behalf of Pro
Logistics because "it's my job as director of truckload operations for Linc."  (Cox Dep., 97).
Earlier in the deposition, Plaintiffs asked "When you were saying Linc earlier, were you
referring to Linc Logistics or Logistics Insight?"  Cox responded "Logistics Insight."  (Cox
Dep., 12).  Cox also stated that he worked for Logistics Insight.  (Cox Dep., 5).  Given that the
Court must draw all reasonable inferences in favor of the non-moving party, the Court will
assume that Cox meant "Logistics Insight" when admitting his general authority to sign
agreements on behalf of Pro Logistics.

[14]There is no dispute that Cox obtained Albright's services on behalf of Pro Logistics.  There is
ambiguity in the record as to whom Cox worked for at the time of the collision.  During his
deposition, Cox stated that he worked for Logistics Insight, not LINC Logistics.  (Cox Dep., 11-
12, 16).  Cox later stated that he did not work for Logistics Insight or Pro Logistics.  (Cox Dep.,
97).

Trucker's Plus that Albright exceeded hours-of-service limits. Cox further confirmed that

he was responsible for "enforcing and insuring that [the driver] abides by the hours of

service guidelines." (Cox Dep., 82-83). Cox's testimony alone establishes a triable issue

as to whether Logistics Insight owed the Plaintiffs a duty to not permit Albright to drive if

he was unqualified or unfit to drive. Injuries caused by its failure to check Albright's

driving or medical record is certainly foreseeable. Moreover, Cox's statements would

support a conclusion that Logistics Insight had "the right or power to control and direct

the physical conduct" of Albright. *See Hougland v. Pulitzer Publishing Co., Inc.*, 939

S.W.2d 31, 33 (Mo. Ct. App. 1997).

### 2. Negligent Entrustment

Plaintiffs Casey and Smith bring claims against Pro Logistics and Logistics Insight

for negligent entrustment. In order to recover on a claim for negligent entrustment under

Missouri law, a plaintiff must prove by a preponderance of the evidence that (1) the

entrustee is incompetent, (2) the entrustor knew or had reason to know of the

incompetence, (3) there was an entrustment of a chattel, and (4) the negligence of the

entrustor concurred with the negligence of the entrustee to harm the plaintiff. *Evans v.

Allen Auto Rental and Truck Leasing, Inc.,* 555 S.W.2d 325, 326 (Mo. banc 1977).

Defendants respond that Albright's "experience-based qualifications" foreclose the

possibility of liability based on the Missouri appellate court's determination in *Portmann

v. Stanley*, 674 S.W.2d 678 (Mo. Ct. App. 1984). In *Portmann*, the appellate court ruled

that parents who entrusted their automobile to their step-son could not have reasonably

11

foreseen injury to others even though the step-son had, in three separate accidents, rolled

his car into a ditch; hit a parked car and fled the scene; and, ran into a fire hydrant. *Id*. at

679. The court found as a matter of law that this did not constitute negligent entrustment

because there was no showing that the step-son was habitually reckless when the three

accidents occurred more than two years previously. *Portmann*, however, makes clear that

the focus in a negligent entrustment case is on whether a defendant could have anticipated

the likelihood of an injury to a third party by the entrustment. *Portmann* is therefore

distinguishable because it did not involve a commercial motor vehicle, the drivers of

which are held to a much higher standard of scrutiny and qualification under both the

FMCSR and industry practice, placing a heavier burden on those who entrust a semi-truck

to a driver. For example, a party who entrusted an automobile to a person convicted of

reckless driving in her personal automobile could not, based on that prior accident alone,

be held liable. However, a commercial motor vehicle operator may not be hired for the

same conviction even if it is within a ten-year look back period. (Golec Dep., 126, 146).

Because *Portmann* did not address entrustment in the context of commercial motor

vehicles and dealt only with a prior driving record rather than qualifications to drive, the

court finds that *Portmann* is not controlling.

A reasonable juror could conclude that Albright, as a commercial motor vehicle

driver, was incompetent by virtue of "age, inexperience, habitual recklessness or

otherwise" where he had omitted his prescription medications from his medical long

form; was convicted of reckless driving and was arguably not well-rested when he drove

12

on the day of the collision.[15]  *See Evans v. Allen Auto Rental and Truck Leasing, Inc.,* 555

S.W.2d 325, 326. (Mo. banc 1977); *United States v. Knight*, 306 F.3d 534, 539 (8th Cir.

2002) ("A driver without sufficient rest presents a safety hazard on the highway, and he

and his vehicle can be pulled out of service.") (citing 49 C.F.R. § 395.13).  Plaintiffs have

also set forth evidence that Pro Logistics and Logistics Insight knew or should have

known about Albright's medical and driving history and logbook violations; that

Logistics Insight obtained Albright's services on behalf of Pro Logistics; and, their

respective negligence caused Plaintiffs' injuries.

### 3.  Negligent Training and Supervision

Defendants assert first that, under Missouri law on negligent supervision, Plaintiffs

must show that Albright's conduct occurred "outside the scope of employment."  (Doc.

490, 30).  Defendants cite in support of their contention *Reed v. Kelly*, 37 S.W.3d 274,

278 (Mo. Ct. App. 2000).  That case relied on the Restatement (Second) of Torts Section

317 (1965) which provides that traditional agency and *respondeat superior* principles

apply to the negligent acts of an employee which are within the scope of employment.  *Id.*

Comment (a).  On the other hand, a claim for negligent supervision only applies to

negligent acts outside the scope of employment.

---

[15]Defendants are not correct that Plaintiffs do not set forth evidence sufficient for a finding of
"incompetence" within the meaning of Missouri law.  Plaintiffs' case is in part based on
Albright's failure to properly inform his physician, James Baldwin, about his medications; his
conviction for a DUI-related reckless driving incident which should have disqualified him under
Pro Logistics' policy; and, the possibility that he drove while under a possibly disqualifying
heart condition.  Moreover, Plaintiffs have set forth evidence that had Pro Logistics and Central
Transport properly monitored Albright's logbook recording activity, he may have had sufficient
rest to avoid the collision on June 1, 2006.

If there had been an admission or finding as to Albright's employer in this case, and that Albright was operating the semi-truck in the scope of his employment, it would be improper to also submit a claim for negligent supervision. *State ex. rel. McHaffie v. Bunch*, 891 S.W.2d 822, 825 (Mo. banc 1995). However, the parties dispute and the evidence conflicts as to which entity was Albright's employer for purposes of *respondeat superior* liability.[16]  So, for example, if Pro Logistics is found to be Albright's employer for purposes of *respondeat superior* liability, no claim for negligent hiring, retention, supervision or training will stand against Pro Logistics. However, those claims could stand as to Logistics Insight and Trucker's Plus. Similarly, if Trucker's Plus is determined to be Albright's employer, negligent hiring, retention, supervision and training claims would stand as to Pro Logistics and Logistics Insight.[17]

Under Missouri law, to make a *prima facie* case for negligent supervision or training, a plaintiff must plead and prove: (1) a legal duty on the part of the defendant to use ordinary care to protect the plaintiff against unreasonable risks of harm; (2) a breach of that duty; (3) a proximate cause between the breach and the resulting injury; and (4) actual damages to the plaintiff's person or property. Under Missouri law, negligent supervision is a variant of the common law tort of negligence. *G.E.T. ex rel. T.T. v.*

---

[16]Indeed, Defendants supporting brief contains both of these dueling propositions. (Doc. 490, 3, 30) ("At the time of the accident, Trucker's Plus HR employed Mr. Albright."); ("There is no evidence to suggest that Albright was acting *outside* the scope of the duties for Pro Logistics when the accident occurred.") (emphasis in original).

[17]Defendants state that Cox's statement that he did not have contact with Albright. (Cox Dep., 49). Cox's alternative testimony supports an inference that he had authority to enforce drivers' hours-of-service recording duties. (Cox Dep., 82-83).

14

*Barron*, 4 S.W.3d 622, 624 (Mo. Ct. App. 1999) (quoting *Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc.*, 700 S.W.2d 426, 431 (Mo. banc 1985)); *also see Nappier v. Kincade,* 666 S.W.2d 858, 860 (Mo. Ct. App. 1984). Thus, the Plaintiffs must show that Pro Logistics and Logistics Insight's failure to properly train or supervise Albright proximately caused their injuries. The Plaintiffs have set forth evidence from which a reasonable juror could conclude that Pro Logistics and Logistics Insight failed to adequately train or supervise Albright. While Pro Logistics notes that it provided written materials to their leased drivers, Plaintiffs have set forth evidence that Pro Logistics made its training "as brief as possible" for its leased drivers; Logistics Insight's Director of Trucking Operations, Larry Cox, was responsible for ensuring that Albright abided by hours-of-service regulations; Pro Logistics failed to require Albright to turn in missing logs; Albright's paycheck should have been withheld for failure to turn in logbooks; neither Pro Logistics nor Cox notified Trucker's Plus about Albright's logbook violations; neither Pro Logistics nor Trucker's Plus disciplined Albright for his logbook violations. (Albright Dep., 349).[18] A reasonable juror could conclude that Albright did not abide by hours-of-service requirements because Pro Logistics and Logistics Insight did not properly train or supervise him. Because Albright did not abide by those regulations for lack of training or supervision, he went on the road fatigued and dangerous.

## III.    Conclusion

---

[18]Defendants are correct that Albright stated that he could not remember any company disciplining him for logbook violations.

Accordingly, it is hereby

ORDERED that Defendants' Motion for Summary Judgment [Doc. # 489] is

DENIED except as to GLS LeasCo.


                                          s/ Nanette K. Laughrey
                                          NANETTE K. LAUGHREY
                                          United States District Judge

Dated:  March 21, 2008
Jefferson City, Missouri