# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| JAMES GARRETT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 06-CV-4137-NKL |
| | ) | (Consolidated with Case Nos. 06-CV- |
| GEORGE MARTIN ALBRIGHT, JR., et al.,) | | 0785, 06-CV-4139, 06-CV-4209 and 06- |
| | ) | CV-4237) |
| Defendants. | ) | |

## ORDER

This case involves four lawsuits that arose from a June 1, 2006, automotive accident on Interstate 70 in which four people died and others were injured.[1]  The defendants are George Martin Albright, Jr. ("Albright"); Trucker's Plus HR, Inc.; GLS LeasCo Corporation ("GLS LeaseCo"); Logistics Insight Corporation ("Logistics Insight"); CenTra, Inc. ("CenTra"); and Pro Logistics, Inc. ("Pro Logistics").[2]

Pending before the Court is Albright's, GLS LeasCo's, Logistics Insight's and Pro Logistics' ("Defendants") Motion for Summary Judgment on the issue of punitive

---

[1]  On January 8, 2008, this Court dismissed Case No. 06-4237-CV-W-NKL, pursuant to Fed. R. Civ. P. 41(a)(2).

[2]  On March 6, 2008, the Court entered default judgment against Central Transport, Inc., and granted summary judgment to Logistics Services, Inc.  (Docs. ## 567, 571).  On March 11, 2006, the Court granted summary judgment to Resolve Staffing, Inc.  (Doc. # 587).

1

damages [Docs. ## 472, 477] and Albright's Motion for Summary Judgment on certain of

Plaintiffs' claims.[3]  For the reasons stated herein, Defendants' Motion is DENIED.

## I.  Background

On June 1, 2006, George Albright, Jr., was driving the tractor-trailer that caused

the accident that is the subject of this case.  On that date, Albright was an employee of

Trucker's Plus and was working as a commercial driver for Pro Logistics.  (Fuston Dep.,

6, 49).  GLS LeasCo leased Albright's tractor unit, VIN 1 HSHXAHR95J045406, to Pro

Logistics.  (Missouri State Highway Patrol Reconstruction Report, 13).[4]  Although

Logistics Insight has provided varying accounts as to the company's purpose and

activities,[5] its Director of Trucking Operations, Larry Cox, negotiated and accepted the

Agreement with Trucker's Plus and maintained some supervisory authority over Pro

---

[3]  The Court will hear oral argument on GLS LeasCo's motion for summary judgment and any ruling as to GLS LeasCo is deferred until that time.

[4]  The power unit displayed Oklahoma registration, 2GK-367, which expired on March 31, 2006.

[5]  Cox testified that Logistics Insight is a holding company for "the truck lines and some of the other operations" of Pro Logistics, Mohican and LINC Ontario.  (Cox Dep., 16-17).  Michael Akkanen ("Akkanen"), the Senior Vice-President of Logistics Insight, testified that Logistics Insight is not a holding company, it is "a real company."  (Akkanen Dep., 8).  Logistics Insight is "a logistics company that is quasi-asset non-asset based that services the OEM industry and the major tier ones."  (Akkanen Dep., 7).  Akkanen further testified that Logistics Insight was "responsible for all of the business opportunities that are offered to us.  We have the people in-house to do the operating engineering portions of the business . . . ."  (Akkanen Dep., 12).  Richard Silverwood ("Silverwood"), the Vice-President of Industrial Relations for Logistics Insight, testified that Logistics Insight was "a logistics management company.  Logistics Insight provide[s] transportation, warehousing, sequencing, subassembly for both automotive and nonautomotive companies."  (Silverwood Dep., 12).  Harold Wolfe, Logistics Insight's President states that it is a "third-party logistics company" that provides marketing, business development and administrative service systems to CenTra subsidiaries.  (Wolfe Dep., 11-12).

Logistics' drivers.[6]  Defendants claim that Plaintiffs evidence is insufficient to support an

award of punitive damages under Missouri law.  Alternatively, Defendants argue that

Michigan law applies to the punitive damages issue in this case.[7]

On September 21, 2005, Trucker's Plus and Pro Logistics entered into a Leasing

Services Agreement ("Agreement") which provided that Trucker's Plus would act as Pro

Logistics' agent for "the sole purpose of providing [qualified] drivers" to Pro Logistics.

(Agreement, 1).[8]  Pro Logistics does its own independent qualifications of a leased driver

through safety services provided by Central Transport.  (Cox. Dep., 101; Murphy Dep.,

99).  Pro Logistics generated and transmitted safety bulletins to its drivers.  (Murphy

Dep., 29).  Pro Logistics also claims that it requires drivers to comply with all laws and

regulations, including turning in drivers' logs.  (Pro Logistics Driver's Manual, 7, 13).

On the day of the collision, Albright drove under Pro Logistics DOT authority and Pro

Logistics was responsible for monitoring Albright's logbooks.  (Kelley Dep., 24, 106).

---

[6]  In addition to general authority to negotiate contracts on behalf of Pro Logistics, Cox,
"make[s] sure that the people in the field have what they need to do their jobs . . . In other words,
they actually make their decisions and do their jobs.  If they have a problem, then they come to
me."  (Cox Dep., 18, 19-21, 97).  While Logistics Insight could not directly reprimand Albright
for logbook violations, upon discovery of a violation, Logistics Insight would "notify the service
and tell [the driver] he's no longer welcome back."  (Cox Dep., 46).

[7]  Defendants rely on briefing provided by Central Transport supporting its Motion for Partial
Summary Judgment.  (Doc. 482).  On March 6, 2008, this Court entered default judgment
against Central Transport in part because of its "cavalier . . . approach to discovery throughout
this litigation . . . [Central Transport] has intentionally confused and misled the Court and the
Plaintiffs.  (Doc. 567).  The Court will consider arguments raised by Central Transport upon
which other Defendants relied.

[8]  Under the Agreement, Trucker's Plus agrees to provide drivers who are qualified under "all
state and federal regulations."  (Agreement ¶ 1).

3

Pro Logistics' Vice-President of Operations, Joseph Golec, agreed that Pro Logistics had

no power to discipline Albright for logbook violations. (Angel Dep., 44-45; Golec Dep.,

9-10, 144-45). Pro Logistics could only observe Albright's violations, report them to

Trucker's Plus, and receive a substitute driver. (Angel Dep., 44-45).

Defendants argue that Albright was a well-qualified driver who complied with

Federal Motor Carrier Safety Regulations. Albright graduated from Tennessee State

Vocational School's tractor-trailer driving program in 1994; he had 12 years "over-the-

road" experience; he had never had an accident or a "near miss"; and, he had never

exhibited disqualifying symptoms as a result of his medical conditions or medications.

(Fuston Dep., 45; Albright Dep., 108, 407-08, 418). At the time Albright completed his

employment application and at the time of the accident, Albright had no disqualifying

offenses on his Motor Vehicles Record under FMCSR 391.15. (Morgan Dep., 206-07).[9]

On June 1, 2006, Albright held a valid Medical Examiner's Certificate issued by his

family physician, James Baldwin, M.D. Baldwin issued the medical certificate for one

year. (Albright Ex. 10; Baldwin Aff. ¶ 2). Baldwin also prescribed diazepam to Albright,

although the parties dispute whether he prescribed it for sleeping or for anxiety.

Trucker's Plus administered a drug screen to Albright at the time of his employment,

---

[9] Pro Logistics' Vice-President of Operations, Joseph Golec gave inconsistent testimony as to
Pro Logistics' policy on hiring drivers with reckless driving convictions. Golec stated that if
[Pro Logistics] knew about [a conviction for reckless driving], we would not use the person."
(Golec Dep., 126). Golec later stated that a reckless driving conviction may disqualify a driver
"depending on the circumstances." (Golec Dep., 146).

4

which he passed.[10]  (Morgan Dep., 209).  Albright attended "more than one" of the

quarterly safety meetings provided by Trucker's Plus although he does not remember how

many.  (Albright Dep., 298).  The Federal Motor Carrier Safety Regulations do not

require motor carriers to obtain Albright's "medical long form" which medical providers

use when examining drivers for qualification.  (Gunther Dep., 241).[11]  It is nevertheless a

motor carrier's duty to make sure that a licensed medical examiner is aware of DOT

requirements in qualifying a driver.  (Morgan Dep., 110).  On July 26, 2006, the DOT

performed a Safety Compliance Review of Pro Logistics, requesting driver qualification

files; drug testing records; payroll records; records of duty status or time records for the

previous six months; driver toll receipts, fuel receipts and telephone records; inspection

reports; and, insurance coverage documents.  (Doc. 480 ¶¶ 86-87).  The DOT gave Pro

Logistics a "satisfactory" rating meaning that a motor carrier has in place and functioning

adequate safety management controls to meet the safety fitness standards in section 385.5

of the FMCSR.  (Guntharp Dep., 303).  Pro Logistics "never" dispatched Albright on trips

---

[10]  Federal Motor Carrier Safety Regulations permit a driver to use a prescribed drug if a licensed
medical practitioner "has advised the driver that the prescribed substance or drug will not
adversely affect the driver's ability to safely operate a commercial motor vehicle."  FMCSR §
391.41(b)(12)(ii)(B).  Baldwin stated that he "advise[d] [Albright] that he should not take the
Diazepam and drive."  (Baldwin Letter, September 28, 2007).  "[Albright] was going to use
[Diazepam] only for sleep."  *Id*.  Baldwin's records and Albright's testimony conflict as to
whether Baldwin prescribed diazepam for anxiety or for sleep.

[11]  The medical "long form" is a Department of Transportation ("DOT") form used by the
medical examiner in the driver qualification process.  If the driver passes the physical
examination in which the long form is used, he or she is issued a medical certificate.  The
Federal Motor Carrier Safety Regulations require only that motor carriers and drivers obtain and
keep the medical certificate approved by a qualified health care professional.  *See* 49 C.F.R. §
391.43(g).

5

which would require him to violate maximum driving time. (Albright Dep., 41). When Pro Logistics learns a driver is unable to perform a scheduled run within his/her hours of service, it will look for an alternative means to complete the run. (Zeidan Dep., 64).

Trucker's Plus generated and transmitted monthly newsletters to its employees, each of which included a safety section. (Fuston Dep., 47). Albright testified that he read the safety section of every Trucker's Plus newsletter. (Albright Dep., 172). Trucker's Plus shows transportation training videos at its quarterly safety meetings. (Fuston Dep., 168).

Plaintiffs have set forth significant evidence supporting their theory that Albright should never have been qualified to drive tractor-trailer units because of his driving and medical history.[12] The Federal Motor Carrier Safety Regulations impose on semi-truck drivers detailed record-keeping requirements as to how the drivers record their on-duty, off-duty and sleeping time during a 24-hour period. The purpose of these regulations is to protect public safety by enforcing the maximum hours that a driver is permitted to drive. *See* 49 U.S.C. § 31502(b). Between May 1, 2006 and May 31, 2006, a logbook audit conducted by Central Transport showed that Albright failed to report logs for nine days

---

[12] Plaintiffs' complementary theory is that Albright was fatigued. Albright claims that he did not talk on his cell phone while driving and "would pull over and stop driving if he felt tired." (Albright Dep., 304, 457). On the day of the collision, Albright's cell phone records show that he made telephone calls totaling 50 minutes over the entire period he claimed he was sleeping. (Albright Dep., 85). Albright claimed that he slept between 6 a.m. and 4:45p.m. the day of the collision. Albright's cell phone records show calls at 5:47 a.m., 6:50 a.m., 12:57 p.m., 1:06 p.m., 4:17 p.m. and 4:20 p.m. Defendants challenge Plaintiffs use of Albright's cell phone records because they cannot be shown to specify the length and location of Albright's calls. Defendants do not challenge the authenticity of the records.

6

and exceeded the permitted hours-of-service on May 11, 2006. (Pl. Ex. O).[13]  Albright

was convicted for "reckless driving" in his personal automobile in 1990.  (Albright Dep.,

323-24).  Albright was cited for speeding in a tractor-trailer in Ohio in 2002.  (Albright

Dep., 43).  Under Pro Logistics policy, a driver with a reckless driving conviction should

not be hired.  (Golec Dep., 126).[14]

Plaintiffs have also set forth substantial evidence supporting their theory that

Albright should not have been hired or retained to drive tractor-trailer units because of his

medical history.[15]  Albright had a heart attack and a stroke in 1997.  (Albright Dep., 366).

Albright suffered his heart attack while driving a commercial motor vehicle.  (Albright

Dep., 198-99).  Albright was diagnosed with non-insulin dependent diabetes in 1997.

---

[13]  Albright's logbook entries and the maintenance of his logbook records have been disputed by
the parties.  Defendants concede that Albright is to submit logbooks "even on days that a driver
is not working" but that Albright's missing logbooks occurred on weekend days and plaintiffs
have "never contested the fact that Albright was not working on those days." (Doc. 546, 22).
Plaintiffs have produced evidence that Albright's dispatch records are inconsistent with
Defendants' theory that Albright was off for all days for which logbooks are missing.  (Pl. Ex. O;
Albright Dep., 158-160).  Defendants' concession that Albright failed to submit drivers' logs and
that they failed to reprimand him supports Plaintiffs' theory that they violated the FMCSR.

[14]  Golec gave conflicting testimony as to Pro Logistics policy.  First, he stated that "[i]f [Pro
Logistics] knew about [a conviction for reckless driving], we would not use the person."
Second, he stated that Pro Logistics may hire a driver with a reckless driving conviction if it was
before the "ten-year look-back period" and "depending on the circumstances."  The court must
draw all inferences in favor of the non-moving party.

[15]  Plaintiffs' complementary theory is that Albright was fatigued.  Albright claims that he did
not talk on his cell phone while driving and "would pull over and stop driving if he felt tired."
(Albright Dep., 304, 457).  On the day of the collision, Albright's cell phone records show that
he made telephone calls totaling 50 minutes over the entire period he claimed he was sleeping.
(Albright Dep., 85).   Albright claimed that he slept between 6 a.m. and 4:45p.m. the day of the
collision.  Albright's cell phone records show calls at 5:47 a.m., 6:50 a.m., 12:57 p.m., 1:06 p.m.,
4:17 p.m. and 4:20 p.m.

(Albright Dep., 366). As a result of these conditions, Albright's physician qualified him for one year only, whereas healthy drivers are generally qualified for two. A qualification for one year only is a "red flag" for a medical condition that requires continuous monitoring. (Cox Dep., 124). According to Plaintiffs, Pro Logistics was under an obligation under general industry practice to follow up on Albright's medical conditions when they observed he was qualified for only one year. (Guntharp Dep., 139). At the time he was hired and as of the day of the collision, Albright was "taking a large number of prescription drugs" which he failed to list on his medical long form. (Albright Dep., 197). On the day of the collision, Albright admits to taking diazepam (Valium), the use of which is prohibited by motor carrier safety regulations unless a medically licensed practitioner advises the driver that the medication will not adversely affect his or her ability to safely operate a commercial motor vehicle. FMCSR § 391.41(b)(12)(ii)(B).[16]

Albright testified that he told Pro Logistics "everything" about his medications.[17]

---

[16] The issue of diazepam's causation in this collision has been disputed by the parties. Albright admitted that he "sometimes" takes diazepam while driving. (Albright Dep., 222-23). Albright quickly qualified his statement saying that he "never" took diazepam and drove, but could not reconcile conflicting record evidence that he took diazepam at 4:00 a.m. and made a cell phone call at 5:47 a.m. when he also claimed he was driving. *Id.* Defendants' medical expert, Charles Reskin, states that no one should take diazepam and drive because it causes drowsiness. (Reskin Dep., 64, 155). Diazepam has a half-life of 20 to 80 hours. (Reskin Dep., 63, 67). Although Albright's post-accident drug screen did not show detectable levels of Diazepam, the dosage prescribed to Albright could be below detectable limits. (Long Dep., 83-84). The only medical conclusions submitted, by Reskin and Defendants' expert Christopher Long, state that diazepam played no role in the collision.

[17] Albright certainly did not testify that he informed Trucker's Plus and Pro Logistics of "every medication" or "diazepam." But, because the Court must draw all inferences in favor of the non-moving party, it must, for purposes of summary judgment, infer that Pro Logistics had knowledge of his medications and medical history as a result of Albright's statements.

8

(Albright Dep., 297). Under common practice, when Pro Logistics noticed that Albright did not list his medications, the person reviewing the medical form would "most likely call" the driver's physician and ask them about their medications. (Guntharp Dep., 41). Pro Logistics and Central Transport employees testified that Trucker's Plus "would have had" the medical long form. (Cummings Dep., 36-37; Kelley Dep., 62).

Plaintiffs also argue that Pro Logistics failed to adequately train their drivers. (Guntharp Report, 10). Pro Logistics provides only a portion of its employee manual to leased drivers in order to make orientation "as brief as possible." (Kelley Dep., 30-31). Pro Logistics makes its training for leased drivers "as brief as possible" because they are not Pro Logistics' employees. (Kelley Dep., 30-31). Plaintiffs have also set forth evidence that Albright frequently violated logbook recording regulations and that Defendants failed to act on or even observe those violations. (Guntharp Dep., 89, 94, 194).[18] Albright does not remember attending any safety meetings provided by Pro Logistics. (Albright Dep., 300). The Agreement between Trucker's Plus and Pro Logistics required that Pro Logistics provide driver training. (Kelley Dep., 28-29). Neither Central Transport nor Pro Logistics conducts regularly scheduled safety meetings. (Golec Dep., 78). Defendants paid Albright notwithstanding a stated policy that failure to turn in logbooks would result in the withholding of pay. (Cox Dep., 46,

---

[18] Defendants argue that Guntharp's methods for checking Albright's logbooks are flawed because he assumed that dispatch records were accurate. (Zeidan Dep., 37-38) ("That's the appointment time that he's supposed to be there by."). Any weaknesses in Guntharp's methods are to be explored at trial. Plaintiffs have set forth abundant evidence that Albright falsified his logbooks and that Pro Logistics and Central Transport failed to adequately monitor his recording activities.

9

95).  Employers of commercial motor vehicle drivers must use other documents to check drivers' logbooks in order to ensure that drivers are not falsifying their hours-of-service. (Guntharp Dep., 155).[19]  Pro Logistics and Trucker's Plus knew generally how many hours he worked (Albright Dep., 277).

On the day of the collision, Albright's logbooks show that he slept in Columbia, Missouri from 6:00 a.m. to 4:45 p.m.  Albright's cell phone records show that he made calls at 5:47 a.m., 6:50 a.m., 12:57 p.m., 1:06 p.m., 4:17 p.m. and 4:20 p.m.[20]  The cell phone records also show that Albright made phone calls from locations inconsistent with his recorded logbook entry.  Albright also admitted that he may have "stopped and slept" and "not necessarily logged it."  (Albright Dep., 349).  An eyewitness, Gina Andrew, testified that Gina Andrew, testified that Albright looked "like he was falling asleep" immediately before the crash.  (Andrew Dep., 15).  Another eyewitness who served as a flagman on I-70 on the day of the collision, Kurt Blacklock, testified that Albright appeared to be "inattentive" before the crash.  (Blacklock Dep., 28).  Where Pro

---

[19]  Pro Logistics submits as evidence a DOT audit which gave Pro Logistics a "satisfactory" rating and cited Albright only for failing to complete a vehicle inspection report.  (Doc. 553, Ex. PP).  Discrepancies in the record are to be explored at trial.

[20]  Albright states in response that the "parties have not agreed upon the accuracy of the records nor has there been any testimony from the cell phone provider as to the accuracy of the records." (Albright Reply Br. 2).  Albright states that the entry for 5:47 a.m. may have been from Washington Park or Washington County, Illinois instead of Washington, Illinois, which is much further away.  "Some of the times listed may be voice mails as shown on the records."  *Id*. at 3. Even if the Court accepted Albright's assertions, which it must not do as Albright is the moving party, a triable issue exists as to whether Albright was sleeping when he claims he was.

10

Logistics' drivers "disregarded" the safety of the public, the parties dispute whether such disregard was "conscious."  (Guntharp Dep., 305).[21]

## II.    Discussion

### A.    Summary Judgment

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, indicates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Castillo v. Ridge*, 445 F.3d 1057, 1060 (8th Cir. 2006), citing *Gipson v. Immigration and Naturalization Service*, 284 F.3d 913, 916 (8th Cir. 2002).  The summary judgment rule is intended "to isolate and dispose of factually unsupported claims" and should be applied to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986).  When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted).  Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25.  The party opposing a motion for summary judgment

---

[21]  Guntharp attributed Pro Logistics' drivers' disregard as "the result of the segmentation of the responsibilities and the failure of anyone to have the appropriate oversight and controls." (Guntharp Dep., 305).

Case 2:06-cv-04137-NKL   Document 671   Filed 03/21/08   Page 11 of 23

must rely on more than conclusory statements or allegations unsupported by facts. *Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004) (citation omitted). The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.

## B. Albright's Medical Qualification under Federal Motor Carrier Safety Regulations

The Court first addresses Albright's contention that he should be granted summary judgment as to Plaintiffs' claim that Albright was not qualified on June 1, 2006 to drive a commercial motor vehicle. Under FMCSR § 391.41, a driver may not use an amphetamine, narcotic or habit-forming prescription drug unless he or she has secured an advisement from a licensed medical practitioner that the prescribed drug will "not adversely affect the driver's ability to safely operate a commercial motor vehicle." *Id.* In this case, there is no dispute that Albright did not advise Baldwin of his medications on his medical long form. (Albright Ex. 6) ("[Albright] did not list all of these medications when he had his physical."). Albright asserts that "the physician determined that it was appropriate for him to operate a commercial vehicle." (Doc. 472, 10). Presumably, Albright is relying on Baldwin's statement, more than a year after the collision, that Albright's additional medications "would not preclude him passing a DOT physical." (Albright Ex. 6). FMCSR § 391.41 obviously requires that the advisement be secured

12

*before* the driver is qualified.  A contrary ruling would authorize drivers to take

prescription drugs with side effects jeopardizing the lives of the driver, the motoring

public and innocent bystanders, as long as a licensed medical practitioner speculated with

hindsight that he or she would have qualified the driver anyway.  The plain language of

the FMCSR prohibits that interpretation.   Therefore, the Court will deny Albright's

motion for summary judgment as to his qualification under federal motor carrier safety

regulations.

### C.    Choice of Law for Punitive Damages

As a threshold matter, Defendants argue that Michigan, not Missouri, law should

apply to Plaintiffs' claims for punitive damages.  Federal district courts sitting in diversity

apply the choice-of-law rules of the state in which they sit.  *Whirlpool Corp. v. Ritter*, 929

F.2d 1318, 1320 (8th Cir. 1991) (citing *Klaxon Co. v. Stentor Elec. Co.*, 313 U.S. 487,

496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)).  Under Missouri's choice-of-law rules,

courts apply the substantive law of the state with the "most significant relationship" to the

occurrence and the parties.  *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 621 (8th Cir.

Mo. 2004) (citing *Thompson v. Crawford*, 833 S.W.2d 868, 870 (Mo. 1992). Citing § 145

of the Restatement (Second) of Conflict of Laws (1971), the court in *Thompson* noted that

the contacts with each state should "be evaluated according to their relative importance

with respect to the particular issue" under consideration.  *Id*. at 870.  ("In the instant case,

the negligent conduct of the driver that caused the accident, as well as the resulting injury,

occurred in Tennessee. The decedent, the negligent driver and the minor plaintiff were

Case 2:06-cv-04137-NKL   Document 671   Filed 03/21/08   Page 13 of 23

residents of Tennessee at the time of the accident.").  Section 145 lists four specific matters that should be considered in determining the applicable law: "the place where the injury occurred"; "the place where the conduct causing the injury occurred"; "the domicil[e], residence, nationality, place of incorporation and place of business of the parties"; and "the place where the relationship, if any, between the parties is centered." *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 621 (8th Cir. Mo. 2004) (citation omitted). "Missouri cases have consistently held that the substantive law of the state in which the fatal injury occurred should apply to the cause of action for wrongful death." *Thompson v. Crawford*, 833 S.W.2d 868, 870 (Mo. 1992); *Dorman v. Emerson Elec. Co.*, 23 F.3d 1354, 1358 (8th Cir. 1994) ("This formulation essentially establishes a presumption that the state with the most significant relationship is the state where the injury occurred, absent an overriding interest of another state based on the factors articulated in section 6.").  Defendants cite *Reis v. Peabody Coal Co.*, 997 S.W.2d 49, 58 (Mo. Ct. App. 1999) for the proposition that Missouri law permits the substantive law of one state to apply to compensatory damages and a different state's substantive law to apply to punitive damages, if another state has the dominant interest with respect to the issue of punitive damages.  Alternatively, Defendants cite *Fanselow v. Rice*, 213 F.Supp.2d 1077 (D. Neb. 2002) for the proposition that, in the commercial motor vehicle context, remedial or punitive damages should be directed toward the corporate employer of the commercial motor vehicle carrier.  *Id.* at 1085.

There is no dispute that the injury to the Plaintiffs occurred in Missouri.

14

The Plaintiffs allege several places where the conduct causing the injury occurred. Albright failed to get adequate rest, took unauthorized prescription medications and falsified his logbooks in Missouri. Trucker's Plus hired, retained, supervised and trained Albright in Tennessee. (Angel Dep., 32, 36, 46, 64, 76-77 ). Trucker's Plus' branch manager, Wilma Angel, negotiated the Agreement under which Pro Logistics retained Albright's services in Tennessee, although Logistics Insight's Director of Trucking Operations, Larry Cox, signed the Agreement on behalf of Pro Logistics in Michigan. (Angel Dep., 36-37). Although the record is unclear, it appears that Cox works primarily from Michigan. (Cox Dep., 6-7). Pro Logistics trained Albright in Tennessee and supervised him from Michigan and Tennessee. (Kelley Dep., 29-30). Central Transport and Pro Logistics failed to monitor Albright's logbooks from Michigan. The True Lease Agreement between GLS LeasCo and Pro Logistics was negotiated in Michigan, but GLS LeasCo arranges to have Pro Logistics pick up equipment where they need it. (Briand Dep., 32).

Six Plaintiffs are from Missouri, two are from Kansas and one is from New Jersey. Albright is a resident of Tennessee. Trucker's Plus is an Ohio corporation. (Doc. 1 ¶ 4). GLS LeasCo, Logistics Insight and Pro Logistics are Michigan corporations. *Id*. ¶¶ 14, 18, 30.

The relationship between Albright, Trucker's Plus, GLS LeasCo, Logistics Insight and Pro Logistics is centered in Tennessee.

Based on these factors, the Court concludes that Missouri law applies to both Plaintiffs' compensatory and punitive damages claims. The injury occurred in Missouri and seriously injured or killed more Missouri residents than any other state. Many of the alleged acts and omissions giving rise to the injury occurred in Missouri. Other than this litigation, there is no relationship between Plaintiffs and Defendants, and the relationship between the Defendants is centered in Tennessee. The Court is unpersuaded as to Defendants' reading of *Reis v. Peabody Coal Co.*, 997 S.W.2d 49, 58 (Mo. Ct. App. 1999). In *Reis*, there was no question that Kentucky law applied to the underlying fraud actions the party only disputed the application of Missouri law to punitive damages. 997 S.W.2d at 59. The appellate court favorably cited *Harlan Feeders v. Grand Lab.*, 881 F. Supp. 1400 (N.D. Iowa), for the proposition that punitive damages are a matter of substantive rather than procedural law. *Reis*, 997 S.W.2d at 71. In concluding that Kentucky law applied to both compensatory and punitive damages, the *Reis* court determined that "[t]his result is also consistent with our Supreme Court's holding that 'the measure and elements of damages are controlled, in tort actions, by the law of the place where the tort was committed, since this pertains to the substance of the right and not to the remedy.'" *Id.*[22] (citing *Stevens v. Missouri Pacific Railroad Co.*, 355 S.W.2d 122, 131 (Mo. 1962)); *compare Vaughan v. Taft Broadcasting Co.*, 708 S.W.2d 656, 660 (Mo. 1986) ("The purpose of punitive damages is to inflict punishment and to serve as an

---

[22] Similarly, in *Harlan Feeder*, upon which *Reis* relies, the Court found that Iowa's choice of law rules required the application of Nebraska law in part because the injury occurred in Nebraska. 881 F.Supp. at 1405-1410.

example and deterrent to similar conduct.").  The Court makes no determination whether a Missouri court may apply different substantive law to punitive damages than compensatory damages, only that the Court's reading of Missouri substantive law suggests a strong presumption for the application of punitive damages based on where the injury occurred.  Similarly, the Court is unpersuaded that it should apply Michigan law based on *Fanselow v. Rice*, 213 F.Supp.2d 1077 (D. Neb. 2002).  In *Fanselow*, the district court determined that the only relationship Nebraska had with the collision was that it served as the location of the injury.  213 F.Supp.2d at 1085.  Also, the district court applied Minnesota law because of its policy of deterring and punishing its own resident corporations.  *See id*.  Here, of course, the collision killed and injured Missouri residents and Missouri has an interest in protecting its citizens.  The Court will apply Missouri law to the issue of liability, compensatory damages and punitive damages.

      **D.**    **Missouri Law on Punitive Damages**

Under Missouri law, punitive damages are appropriate where a party "either knew or had reason to know that there was a high degree of probability that the defendant's conduct would result in injury." *Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc.*, 700 S.W.2d 426, 436 (Mo. 1985).  With such a showing, a plaintiff can recover for aggravating circumstances based upon the defendant's complete indifference to or conscious disregard for the safety of others.  *Lopez v. Three Rivers Elec. Coop.*, 26 S.W.3d 151, 160 (Mo. 2000) (citation omitted).  "Some element of outrage is required" to sustain an award of punitive damages *Bhagvandoss v. Beiersdorf, Inc.*, 723 S.W.2d 392,

397 (Mo. 1987). Clear and convincing proof supporting submission of a punitive damages instruction to the jury is proof "which instantly tilts the scales in the affirmative when weight against the evidence in opposition; evidence which clearly convinces the fact finder of the truth of the proposition to be proved." *Hoskins v. Business Men's Assurance*, 116 S.W. 3d 557, 566 (Mo. Ct. App. 2003). Defendants argue that Plaintiffs have not set forth clear and convincing proof supporting punitive damages. Defendants are incorrect.

Under Missouri law, punitive damages are permissible where a trucking company fails to observe motor carrier regulations and industry standards which result in injury. *Coon v. Am. Compressed Steel, Inc.*, 207 S.W.3d 629, 638 (Mo. Ct. App. 2006) (sustaining award of punitive damages because the motor carrier had shown a conscious disregard for public safety in failing to comply with federal and state motor carrier regulations and industry standards); *see also Trotter v. B&W Cartage Co.*, 2006 WL 1004882 (S.D. Ill. April 13, 2006) (applying Missouri law) ("The evidence of record also suggests that the conduct of B&W employees like the managers of the company's terminals in Clayton, Ohio and Gary, Indiana, was such as to send a message to drivers that hours of service violations were acceptable conduct."); *Pierce v. Platte-Clay Electric Cooperative, Inc.*, 769 S.W.2d 769, 772 (Mo. 1989) ("Evidence of industry standards is generally admissible as proof of whether or not a duty of care was breached."). In *Lopez* specifically, the Missouri Supreme Court ruled that a "knowing violat[ion of] a statute, regulation, or clear industry standard designed to prevent the type of injury occurred" is a

18

factor to be considered when submitting a jury instruction on punitive damages. 26 S.W.3d at 160; *see also Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 249 (Mo. 2001). In this case, Plaintiffs have set forth clear and convincing evidence that Pro Logistics and Logistics Insight not only failed to observe clear industry standards for monitoring safe driving, but also failed to observe their own corporate policies, both of which had the clear purpose of preventing injury to the motoring public from unsafe drivers. Pro Logistics and Logistics Insight assert that "Pro Logistics complied with the applicable federal regulations in this case," although Plaintiffs have set forth evidence disputing that assertion.[23] For example, "Pro Logistics and [Central Transport], failed to require George Albright to provide missing logs in both April, 2006 and May, 2006." (Guntharp Report ¶ 20). Albright testified that he told Pro Logistics "everything" about his medications, although there is no evidence Pro Logistics secured a release for each medication or even followed up on potentially disqualifying medications or medical history.[24] (Albright Dep., 297). Logistics Insight's Director of Truckload Operations, Larry Cox, testified

---

[23] Defendants cite *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 892-93 (2000) (Stevens, J. dissenting) for the proposition that a good faith effort to comply with government regulations would be evidence of conduct inconsistent with the mental state requisite for punitive damages. In his dissent, Justice Stevens also noted that substantial compliance with a regulatory scheme did not bar an award of punitive damages. *Id*. (citing *Silkwood* v. *Kerr-McGee Corp.*, 485 F. Supp. 566, 583-584 (W.D. Okla. 1979). Similarly, the Defendants will be able to present evidence at trial that they complied with motor carrier safety regulations. *See Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 383 (8th Cir. 1992).

[24] Albright did not testify that he informed Pro Logistics of "every medication" or "diazepam." But, because the Court must draw all inferences in favor of the non-moving party, it must, for purposes of summary judgment, infer that Pro Logistics had knowledge of his medications and medical history as a result of Albright's statements.

that Albright was paid despite an explicit policy withholding paychecks unless logbooks were submitted. Indeed, some of Albright's logbooks from 2006 remain missing, a claim which casts doubt on Pro Logistics' assertion that the DOT's safety review of July 2006 immunizes it from a finding of reckless conduct. If a jury concludes that Pro Logistics knew about Albright's medications and failed to secure a release from Albright's physician specifically stating that they would not affect his ability to drive safely, Pro Logistics would not be in compliance with federal regulations. FMCSR § 391.41(b)(12)(ii)(B). A reasonable juror could conclude from the evidence that Pro Logistics and Logistics Insight knew about Albright's heart condition, prescribed medications and history of reckless driving and allowed him to drive regardless. The Court finds persuasive a decision from the Western District of Pennsylvania considering whether a commercial motor vehicle driver's actions warranted a jury determination as to punitive damages:

> A reasonable jury similarly could find that: failure to monitor Micou's conduct; failure to make an adequate and proper investigation and inquiry into Micou's driving and employment record; awareness of Micou's prior accident of September 17, 2002 yet failure to conduct any investigation into Micou's hours of service; Micou's involvement in five preventable accidents/incidents while employed at Decker; Micou's participation in three accidents and two suspensions of his driving privileges between 1999 and 2002, prior to being hired by Decker; Decker re-dispatching Micou even though he had exceeded his hour of service limitations; and failure to have effective procedures in place to verify drivers' hours of service when Decker knew that hours of service regulations were in place to protect the safety of the monitoring public, constitutes 'reckless indifference to the rights of others' and accordingly warrants the imposition of punitive damages against Decker. *Came v. Micou*, 2005 U.S. Dist. LEXIS 40037 (M.D. Pa. 2005).[25]

---

[25] Defendants cite *Burke v. Maassen*, 904 F.2d 178 (3d Cir. 1990) which the *Micou* court distinguished on the basis that the plaintiffs failed to prove that the driver in *Burke* "failed to

Albright is being separately tried by the State of Missouri for second-degree manslaughter, which requires only a "criminal negligence" level of scienter. Specifically, the state must prove that Albright "fail[ed] to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." Mo. Rev. Stat. § 562.016. Albright claims that because he is not charged with crimes requiring a higher degree of criminal scienter, circumstances for punitive damages must not exist.[26] Albright is incorrect. In order to be found guilty of first-degree manslaughter, a Missouri prosecutor must prove beyond a reasonable doubt that Albright consciously disregarded a substantial risk to Plaintiffs. In order to support a claim for punitive damages, Plaintiffs must only set forth "clear and convincing" evidence as to his recklessness or conscious disregard for public safety. *See Lopez*, 26 S.W.3d at 160. Albright conceded that he knew he did not complete his medical long form "completely and accurately" in obtaining his medical certificate. (Albright Dep., 197). Plaintiffs' evidence that Albright's cell phone records directly dispute his claim of sleep before the collision is the kind of "clear and convincing" proof that supports a claim that Albright

---

establish that the driver consciously appreciated the risk he had created." In this case, Plaintiffs have set forth evidence that Albright knew the safety purpose of logbook record keeping requirements. (Albright Dep., 75-79, 80-81, 130-32).

[26] Under Mo. Rev. Stat. § 562.016.4, a person "acts recklessly" or is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.

knowingly disregarded rules of the road meant to ensure the safety of the motoring

public. *See Came v. Micou*, 2005 U.S. Dist. LEXIS 40037 (M.D. Pa. 2005):

> With respect to Micou, a reasonable jury could conclude that: logging more than seventy hours during an eight day period; operating the Decker rig when he was too tired to do so safely as evidenced by Micou's initial statement on a company accident form that he "momentary [sic] blanked out," his inability to make a decision relative to taking steps to avoid colliding with a slower moving vehicle traveling ahead of his vehicle, his inability to perceive the passage of time from the point when he realized the vehicle ahead was moving slowly to when he collided with the rear of it, and his failure to disengage the cruise control on a vehicle with which he was familiar; combined with falsifying his logs, all in violation of Department of Transportation safety regulations constitutes 'reckless indifference to the rights of others.' See 49 C.F.R. 395.3(b)(2), 392.3, and 395.8. *Id.*

### E.      Federal Constitution

The U.S. Supreme Court has determined that punitive damages may properly be

imposed to further a State's legitimate interests in punishing unlawful conduct and

deterring its repetition. *BMW of N. Am. v. Gore*, 517 U.S. 559, 568 (1996) (citing *Gertz*

v. *Robert Welch, Inc.*, 418 U.S. 323, 350, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974)).

Defendants claim that if Missouri law is invoked to permit the imposition of punitive

damages in this case, that law is unconstitutionally vague because it 1) fails to provide

Defendants with a reasonable ability to know what conduct is prohibited and 2) permits

arbitrary and discriminatory enforcement by plaintiffs and juries. *Honda Motor Co. v.*

*Oberg*, 512 U.S. 415, 434 (1994). The U.S. Supreme Court has limited the imposition of

punitive damages where a jury punishes a defendant for harm caused to non-parties and

where an excessive award threatens Due Process protections. *Philip Morris USA v.*

*Williams*, 127 S. Ct. 1057, 1063 (2007). In this case, the Defendants are certainly on

22

notice of the dangers presented to the motoring public by virtue of failing to monitor their compliance with Federal Motor Carrier Safety Regulations and industry standards for safe conduct. Indeed, Defendants have strenuously argued their compliance with those regulations. Therefore, submission of a punitive damages instruction to the jury would not violate Defendants' due process rights.

III.     **Conclusion**

Accordingly, it is hereby

ORDERED that Defendants' Motions for Summary Judgment [Docs. ## 472, 477] are DENIED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  March 21, 2008
Jefferson City, Missouri