IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| JAMES GARRETT et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:06-CV-4137-NKL |
| | ) | |
| GEORGE MARTIN ALBRIGHT, JR., | ) | |
| PRO LOGISTICS, INC. et al., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on CenTra Inc.'s Motions to Dismiss and its

Motion for Reconsideration [Docs. ## 560, 562, 597]. CenTra Inc.'s motions are

DENIED.

**I.      Background**

A thorough background of the litigation is necessary to put in context Centra's

Motion for Reconsideration and Motion to Dismiss.  Plaintiffs originally brought this

action against Defendants George Albright, Jr. ("Albright"), CenTra, Inc., Central

Transport, Inc. ("Central Transport"), GLS LeasCo, Logistics Insight, Logistics Services

and Pro Logistics, Inc. ("Pro Logistics"), Trucker's Plus HR, Inc. ("Trucker's Plus"), and

Resolve Staffing, Inc., to recover damages for personal injuries and wrongful death

resulting from a semi-truck collision occurring on I-70 on June 1, 2006.[1]  At the time of

_____

[1]On March 6, 2008, the Court entered default judgment against Central Transport, Inc.,
and granted summary judgment to Logistics Services, Inc.  (Docs. ## 567, 571).  On March 11,
2006, the Court granted summary judgment to Resolve Staffing, Inc.  (Doc. # 587).  On March

the collision, Albright was an employee of Trucker's Plus, driving a tractor-trailer unit owned by GLS LeasCo. On June 1, 2006, Albright drove under the DOT authority of Pro Logistics which had 1) leased Albright from Trucker's Plus; 2) leased the tractor-trailer unit from GLS LeasCo; and, 3) contracted with Central Transport to provide safety services including driver verification, logbook auditing and drug and alcohol testing. (Christ Dep., 17-19). Plaintiffs allege that the collision was caused in part by Defendants' failure to hire, supervise and train safe drivers and/or safely monitor and service their motor carrier units.

CenTra is the direct or indirect parent company of Central Transport, GLS LeasCo, Logistics Insight, Logistics Services and Pro Logistics. CenTra is a holding and investment company comprised of approximately 50 subsidiaries. (Harned Dep. 8). Norman Harned is the Vice-President and Secretary of CenTra who has been an officer of CenTra since shortly after its formation in 1973. (Harned Dep., 6-7). Harned provided his deposition to Plaintiffs on May 2, 2007. The President of CenTra is Manuel John Moroun and the Vice-Chairman and Executive Vice-President is Matthew T. Moroun (together the "Morouns"). (Harned Dep., 11-12). The Morouns are the only owners of CenTra. (Harned Dep., 18). Agnes Moroun is the Vice-President of Human Resources for Central Transport. (Doc. 597, 11).

The discovery process has been complicated because of the "opaque and overlapping relationship" between the parties which are indirect or direct subsidiaries of

_____

29, 2008, the Court granted summary judgment to GLS LeasCo. (Doc. # 710).

2

CenTra. (Doc. 567, 3). Within the deposition and documentary evidence, there is no consistent story as to the ownership structure of these subsidiaries before or after the date of the collision.[2]

Plaintiffs filed their original action on July 3, 2006. (Doc. 1). On November 1, 2006, Logistics Insight and Pro Logistics entered their disclosures of corporate interests stating that their parent companies were "Linc Logistics Corp. and Centra, Inc." (Doc. 16, 17 ¶ 1). On January 17, 2007, Central Transport entered its disclosure of corporate interests stating that "Central Transport, Inc.'s parent company is CenTra, Inc., and it has no subsidiary companies that are not wholly owned or affiliates . . . ." (Doc. 54 ¶ 1).[3]

---

[2]There has also been considerable shifting of corporate names and locations. For example, all the corporate Defendants shared their location at 12225 Stephens Road, Warren, Michigan, before the end of 2006. Between the end of 2006 and February 2007, Pro Logistics moved to 11355 Stephens Rd., Warren, Michigan. See Doc. 187 ¶ 21 ("Uncontroverted that Pro Logistics, Inc., moved its business operations to 11355 Stephens Road, Warren, Michigan 48089 during late 2006."). It also appears that Logistics Insight moved to 11355 Stephens Road around the same period. Testimony has conflicted, for example, as to when certain CenTra subsidiaries changed name or structure. Central Transport's Vice-President, Thomas Christ, stated that Pro Logistics was a subsidiary of Logistics Insight, while Joseph Golec, Pro Logistics' Vice-President of Operations and a former employee of Central Transport, stated that the parent company of Pro Logistics, Inc., was LINC Logistics. (Christ Dep. 16); (Golec Dep. 11). At the time of the collision, CenTra states both 1) that it was the direct parent company owning 100% of the shares of Pro Logistics (Doc. 187 ¶ 14) ("Uncontroverted that CenTra, Inc. owned the stock of Pro Logistics, Inc. until the latter half of 2006."); and 2) that it was the indirect parent company owning 100% of LINC Logistics (Harned Dep., 8) ("How long has [LINC Logistics been a subsidiary of CenTra and Pro Logistics a subsidiary of LINC Logistics?]" "My estimate would be three, four years.")).

[3]On march 12, 2008, less than a month before trial and after the Court noted the inconsistency between the filings and Defendants' assertions as to CenTra's ownership of Central Transport (Doc. 586 n. 6), Central Transport filed an amended disclosure of corporate interests stating that "Central Transport, Inc.'s parent company is Central Transport International, Inc. . . ." (Doc. 592).

Case 2:06-cv-04137-NKL   Document 732   Filed 04/01/08   Page 3 of 25

Central Transport and CenTra have been represented by the same counsel throughout most of the litigation.[4] On January 5, 2007, CenTra answered Plaintiffs' original complaint, denying that this Court had in personam jurisdiction over CenTra based either on Missouri's Long Arm Statute or consistent with its due process rights guaranteed under the U.S. Constitution. (Doc. 40 ¶ 77); (Doc. 43 ¶ 76). On January 17, 2007, CenTra and Central Transport jointly requested leave to file answers to Plaintiffs' claimed damages out of time which CenTra did on January 19, 2007. (Doc. 52; Doc. 57 ¶ 77). On February 9, 2007, CenTra again filed jointly with Central Transport for an extension of time to respond to Plaintiffs' written discovery. (Doc. 74). CenTra did not request any special or limited appearance for the purpose of contesting personal jurisdiction. *See Schilling v. Human Support Servs.*, 978 S.W.2d 368, 370 (Mo. Ct. App. 1998); *MAK Automation, Inc. v. G.C. Evans Sales & Mfg. Co.*, 2008 U.S. Dist. LEXIS 4432 (E.D. Mo. Jan. 18, 2008).[5]

---

[4]Several attorneys have entered appearances in this litigation, but CenTra and Central Transport have been jointly represented by Horn, Aylward & Bandy since January 5, 2007, and Jeffrey Stewart since July 9, 2007. Larry Ward has also recently entered his appearance on behalf of CenTra.

[5]On June 27, 2007, after being told that none of the Defendants had produced Albright's original logbooks on which he recorded his hours of service, the Court ordered that all parties including their affiliates and subsidiaries produce the missing documents by July 12, 2007, or explain why they could not be produced and what efforts had been made to locate the missing documents. (Doc. 193). On July 11, 2007, CenTra jointly filed with Central Transport a "Notice of Compliance" with the Court's Order stating that "CenTra, Inc. and Central Transport, Inc. hereby notify the Court that it cannot produce such items as they were not and are not in their respective possession, custody, and/or control." (Doc. 208 ¶ 1). CenTra repeated that it had no relationship with Albright and was not a motor carrier. *Id.* ¶ 2. CenTra again did not request any special or limited appearance for purposes of contesting personal jurisdiction.

4

On March 22, 2007, CenTra filed a motion for summary judgment on the basis that it "did not employ George Albright or authorize him to act on its behalf in any capacity." (Doc. 107). On June 4, 2007, Plaintiffs filed their opposition to CenTra's motion claiming in part that CenTra was "the alter ego of its subsidiaries and affiliates named as defendants in this case." (Doc. 163 ¶ 6). Plaintiffs asserted alter ego liability against CenTra on the basis of undercapitalization and failure to obtain insurance as provided under Pro Logistics Agreement with Trucker's Plus. (Doc. 163, 39-41). At that point, Plaintiffs had not yet received any information about Central Transport International, Inc. ("Central Transport International"), or LINC Logistics Corp. ("LINC Logistics"), which appear to be subsidiaries of CenTra.[6] Logistics Services and Logistics Insight had cancelled depositions scheduled for May 21, 2007.

On August 9, 2007, this Court determined under Missouri corporate law and the Eighth Circuit's decision in *Radaszewski v. Telecom*, 981 F.2d 305, 308 (8th Cir. 1992), that Plaintiffs did not set forth sufficient evidence to "pierce" CenTra's corporate veil based on a theory of undercapitalization. *Radaszewski* stands for the proposition that motor carriers are sufficiently capitalized as a matter of law if they meet federal financial responsibility requirements. Based on this understanding and the record before it at that time, the Court also denied Plaintiffs request to amend their complaints to include LINC Logistics and Central Transport International. (Doc. 418).

---

[6] The entity is referred to as LINC Logistics Corp. in disclosures of corporate interests filed by Pro Logistics and Logistics Insight, but as LINC Logistics Company in the present motion. The Court will simply refer to LINC Logistics.

On August 20, 2007, Plaintiffs requested this Court to reconsider its summary judgment ruling in favor of CenTra introducing newly discovered evidence as to CenTra's control over its subsidiaries and alleging that CenTra used its subsidiaries to violate positive legal duties Missouri and federal law impose on the owners of motor carriers to comply with motor carrier safety regulations. On January 30, 2008, the Court granted Plaintiffs' motion and vacated its summary judgment ruling in favor of CenTra. (Doc. 538).

CenTra now argues that Plaintiffs failed to plead "veil-piercing" under Missouri law; failed to join indispensable parties; and, this Court lacked personal jurisdiction over CenTra. CenTra further argues that "facts" the Court relied upon are not supported by the record or are "simply incorrect" and that Mo. Rev. Stat. § 390.171, which imposes criminal liability on owners of motor carriers for violation of motor carrier safety regulations, does not apply. (Doc. 597, 1, 13).[7]

## II. Discussion

### A. Alter Ego Liability

---

[7]CenTra notes that "Plaintiffs' motion for reconsideration, memorandum in support, and reply memorandum *never* mentioned any reference to Missouri statutes." (Doc. 597 n.3) (emphasis in original). A federal court sitting in diversity "is required to ascertain and apply state law no matter how onerous the task . . . ." *Filla v. Norfolk & Southern Ry.*, 336 F.3d 806, 811 (8th Cir. 2003). This is particularly true in the context of granting summary judgment in tort cases where "a multitude of factual issues and abstract concepts" are encompassed by the alleged wrong. *Hughes v. American Jawa Ltd.*, 529 F.2d 21, 22 (8th Cir. 1976). At any rate, because the issue has been raised in CenTra's Motion for Reconsideration, CenTra has had an opportunity to present its full position to the Court. It has also had an opportunity to raise any dispositive issues even though CenTra returned to the case after the dispositive motion deadline passed.

As a threshold matter, CenTra claims that Plaintiffs failed to allege sufficient facts to state a claim for relief under a veil-piercing theory under Missouri law. Fed. R. Civ. P. 12(h)(2). While the Plaintiffs did not plead veil-piercing until March 11, 2008, all parties, as well as the Court, have proceeded since June 4, 2007, as if Plaintiffs had alleged alter ego liability against CenTra and for which Plaintiffs have set forth sufficient facts and evidence to support a claim for relief since August 20, 2007. (Doc. 163). There is no evidence that Plaintiffs' motion to amend their pleadings was made in bad faith and CenTra can claim no prejudice by the Court permitting Plaintiffs to correct their Complaints to reflect a theory of which CenTra has been aware throughout this litigation, and actually litigated in its motion for summary judgment. *See Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998). For these reasons, the Court has previously granted Plaintiffs' leave to amend their Complaints.

**B.      Personal Jurisdiction**

By its conduct a party may waive objections to personal jurisdiction. *MAK Automation, Inc.v. G.C. Evans Sales & Mfg. Co.*, 2008 U.S. Dist. LEXIS 4432 (E.D. Mo. Jan. 18, 2008) (citing *Knowlton v. Allied Van Lines, Inc.*, 900 F.2d 1196, 1199 (8th Cir. 1990); *Van Praag v. Columbia Classics Co.*, 849 F.2d 1106, 1109 (8th Cir. 1988) (citation omitted). An objection to personal jurisdiction may be waived by not asserting it in a timely manner. *Knowlton*, 900 F.2d at 1199. Additionally, a defendant "may submit to the jurisdiction of the court by appearance." *MAK Automation, Inc.v. G.C. Evans Sales & Mfg. Co.*, 2008 U.S. Dist. LEXIS 4432 (E.D. Mo. Jan. 18, 2008) (citing *Insurance*

7

*Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)).

A defendant may make a limited or special appearance for purposes of contesting

personal jurisdiction. "If the appearing party requests relief or discloses a purpose that

goes beyond challenging the jurisdiction of the court over the subject matter or the

parties, the appearance will be considered general, and all jurisdictional challenges will be

deemed waived." *Id.* (citing *Nationwide Eng'g & Control Sys., Inc. v. Thomas*, 837 F.2d

345, 347 (8th Cir. 1988)). "By submitting extensive memoranda to the district court" a

defendant waives its right to contest personal jurisdiction. *Id.* (citing *DeBoer v. Mellon

Mortg. Co.*, 64 F.3d 1171, 1176 (8th Cir. 1995)).

   After filing its answer on January 19, 2007, CenTra raised no special or limited

appearance to contest this Court's exercise of personal jurisdiction and CenTra has

waived any objection to personal jurisdiction. In its Motion for Summary Judgment,

CenTra raised arguments only as to the proper application of Missouri law. (Doc. 107).

Between January 19, 2007 and August 9, 2007, CenTra's counsel entered its appearances

without indicating that they were for the limited purpose of contesting personal

jurisdiction. *See Yeldell v. Tutt*, 913 F.2d 533, 539 (8th Cir. 1990). Additionally, CenTra

availed itself of the court's procedures by filing documents and participating in court

proceedings. *See id.* This conduct included, *inter alia*, requesting additional time to

respond to written discovery, participating in discovery conferences, filing a Notice of

Compliance with the Court's discovery order, requesting and participating in settlement

negotiations and requesting a final and preclusive judgment on the merits of Plaintiffs'

8

claims. These final actions demonstrate CenTra's clear request for relief beyond challenging jurisdiction. *See MAK Automation, Inc. v. G.C. Evans Sales & Mfg. Co.*, 2008 U.S. Dist. LEXIS 4432 (E.D. Mo. Jan. 18, 2008). The Court finds that CenTra has by its conduct waived any objections which it might have to personal jurisdiction. *See id.*; Fed. R. Civ. P. 12(b)(2).

### C. Failure to Join "Indispensable" Parties

Under Fed. R. Civ. P. 12(h)(2) and Fed. R. Civ. P. 19(b), a party may preserve a defense for failure to join an indispensable party under Fed. R. Civ. P. 19(b) in any pleading ordered or allowed under Fed. R. Civ. P. 7(a); by a motion under Fed. R. Civ. P. 12(c); or, at trial. CenTra argues that Central Transport International and LINC Logistics are indispensable parties. As a threshold matter, CenTra's motion to dismiss for failure to join an indispensable party at this point is the kind of strategic pleading that the Eighth Circuit has consistently rejected. *Baker Group, L.C. v. Burlington Northern & Santa Fe Ry.*, 451 F.3d 484, 491 (8th Cir. 2006) ("Not until six years after the case was filed, after the district court made adverse rulings limiting the issues to be tried, did the Baker Group assert that CBC is an indispensable party and the suit must be dismissed without prejudice. It is hard to imagine a clearer case of abusive forum shopping. The Baker Group's appeal of this issue is frivolous."); *Ranger Transp., Inc. v. Wal-Mart Stores*, 903 F.2d 1185, 1187 (8th Cir. 1990) ("[Wal-Mart] merely raised the issue of indispensability, and then moved to dismiss the suit after the district court's joinder deadline had passed. Any notion that the district court erred in refusing to dismiss the suit in these

9

circumstances is wholly without merit."). CenTra made no effort to join allegedly "indispensable" Central Transport International and LINC Logistics under this Court's original or amended scheduling orders, nor did either entity seek to intervene. (Doc. 39, 113). Central Transport's attorney who also represented CenTra, entered an opposition to Plaintiffs' motion to amend their complaints to add these absent entities, apparently on behalf of Central Transport International and an affiliated entity, LINC Logistics. At that time, CenTra did not contend that these entities were indispensable parties.

Even if the Court considered CenTra's motion a valid exercise for seeking protections afforded under Rule 19, CenTra's motion fails because Central Transport International and LINC Logistics are not required to be joined under Rule 19(b).[8] That Rule provides four guideposts for determining whether an action can continue in equity and good conscience.

> First, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

*United States ex rel. Steele v. Turn Key Gaming, Inc.*,135 F.3d 1249, 1251 (8th Cir. 1998).

Rule 19 is a "pragmatic rule whose application turns on considerations of efficiency

---

[8] CenTra contends that Central Transport International and Linc Logistics are not subject to personal jurisdiction in Missouri. For purposes of CenTra's motion only, the Court will assume that these subsidiaries are not subject to personal jurisdiction in this litigation. Therefore, the Court need not resolve the question of whether Central Transport International or Linc Logistics are parties needed to be joined if feasible under Rule 19 (a).

and fairness in the particular case." *See Pujol v. Shearson/American Express, Inc.*, 877 F.2d 132, 134 (1st Cir. 1989)*; see also Ranger Transp., Inc. v. Wal-Mart Stores*, 903 F.2d 1185, 1187 (8th Cir. 1990). All four elements weigh in favor of denying dismissal. CenTra has asserted potential prejudice on its own behalf and speculates as to the interests of LINC Logistics and Central Transport International. However, should a jury find Central Transport or Pro Logistics liable, the Court would be able to fashion adequate relief against CenTra alone, without causing injury to any absent entity. Because there is a factual dispute about whether CenTra owned Pro Logistics on the date of the accident and a reasonable jury may determine that fact adverse to CenTra, the double veil-piercing dispute may never be reached. It is also arguable that Central Transport need not be a direct subsidiary of CenTra in order for a veil-piercing theory to succeed against CenTra. *See Kleweis v. Transport Support, Inc.*, 972 F. Supp. 494, 495 (E.D. Mo. 1997). Most importantly, dismissing the Plaintiffs' action against CenTra would not give Plaintiffs an adequate remedy, given the amount of time spent in this litigation to date and the absence of any effort by Central Transport International and LINC Logistics, two parties owned by CenTra, to intervene in this litigation. The Court will not dismiss under Fed. R. Civ. P. 19(b).

### D.    Manifest Injustice

CenTra also argues that this Court made several errors of fact and law in its January 30, 2008 Order vacating the grant of summary judgment to CenTra. (Doc. 597). CenTra presents new evidence as to its ownership of Pro Logistics at the time of the collision and

11

argues that there is insufficient evidence to support a finding of control. CenTra's general theory is that it is not possible, as a matter of law, for a parent corporation to be liable for the negligence of its subsidiary companies where it does not act affirmatively to control its subsidiary. As set forth below, Plaintiffs have set forth sufficient evidence such that a reasonable juror could conclude that CenTra controlled Central Transport and Pro Logistics for an improper purpose which caused Plaintiffs' injuries.

### 1. Missouri Law on Alter Ego Liability

Generally, an individual injured by the conduct of a corporation can only recover from that particular corporation. *Radaszewski v. Telecom Corp.*, 981 F.2d 305, 307 (8th Cir. 1992), *cert. denied*, 508 U.S. 908, 124 L. Ed. 2d 248, 113 S. Ct. 2338 (1993). The shareholders of a corporation, including the parent company if the corporation is a wholly-owned subsidiary, are not liable for the injury. *Radaszewski v. Telecom Corp.*, 981 F.2d 305, 307 (8th Cir. 1992). Missouri law permits exceptions to this general rule which allow the injured party to "pierce the corporate veil" and reach the assets of the parent corporation. *Kleweis v. Transport Support, Inc.*, 972 F. Supp. 494, 495 (E.D. Mo. 1997). In order to hold CenTra liable for the conduct of its subsidiaries, the Plaintiffs must show: (1) that the defendant completely dominates and controls the finances, policy, and business practices of the corporate entity with respect to the transaction in dispute; (2) such control must have been used by the defendant for an improper purpose; and (3) the defendant's control of the corporate entity must have caused the plaintiff's injury. *Radaszewski*, 981 F.2d at 306; *Kleweis v. Transport Support, Inc.*, 972 F. Supp. 494, 495 (E.D. Mo. 1997);

12

*Paglin v. Saztec Int'l, Inc.*, 834 F. Supp. 1184, 1191 (W.D. Mo. 1993); *see also Dwyer v. ING Inv. Co.*, 889 S.W.2d 902, 904-05 (Mo. Ct. App. 1994) ("The alter ego test was articulated in *Swall v. Custom Automotive Services, Inc.*, 831 S.W.2d 237 (Mo.App. 1992) [1] as requiring the court to find first that 'the corporation must be controlled and influenced by persons or by another corporation; second, the evidence must establish that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetrate a fraud.' The doctrines behind the [instrumentality and alter ego] tests are basically the same and we regard the tests as interchangeable.") (citation omitted).

To determine whether the parent controls the subsidiary for purposes of piercing the corporate veil, courts consider the following factors:

1) The parent corporation owns all or most of the capital stock of the subsidiary;

2) The parent and subsidiary corporation have common directors or officers;

3) The parent corporation finances the subsidiary;

4) The parent corporation subscribes to all of the capital stock of the subsidiary or otherwise causes its incorporation;

5) The subsidiary has grossly inadequate capital;

6) The parent corporation pays the salaries and other expenses or losses of the subsidiary;

7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;

8) In the written material of the parent corporation, the subsidiary is described as a department or division of the parent, or its business or financial responsibility is referred to as the parent corporation's own;

13

9) The parent corporation uses the property of the subsidiary as its own;

10) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation and the latter's interest;

11) The formal legal requirements of the subsidiary are not observed.

*Paglin*, 834 F. Supp. at 1191-92 (citing *Collet v. American Nat'l Stores, Inc.*, 708 S.W.2d 273, 284 (Mo. App. 1986)). Depending on the circumstances, any combination of these factors may lead to a determination that the parent corporation sufficiently controls the subsidiary to allow piercing of the corporate veil. *Kleweis v. Transport Support, Inc.*, 972 F. Supp. 494, 495 (E.D. Mo. 1997) (citing *Paglin*, 834 F. Supp. at 1191). Plaintiffs must also set forth evidence that a defendant used an affiliated entity for an improper purpose which requires the plaintiff to show that the control exercised by the defendant involved a fraud or wrong, the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights. *Radaszewski*, 981 F.2d at 306. In such a situation, when the formal corporate separateness and the arrangements between the two corporations is devised or used to accomplish a fraud, injustice, or some unlawful purpose, then the separate formal corporate structures will be ignored. *Camelot Carpets v. Metro Distributing Co.*, 607 S.W.2d 746, 749 (Mo. Ct. App. 1980).

Most veil-piercing theories allege undercapitalization or establishing shell companies to avoid paying creditors. *See 66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32 (Mo. 1999); *Real Estate Investors Four, Inc. v. Am. Design Group*, 46 S.W.3d 51 (Mo. Ct. App. 2001); *Sansone v. Moseley*, 912 S.W.2d 666 (Mo. Ct. App.

14

1995); *K.C. Roofing Center v. On Top Roofing, Inc.*, 807 S.W.2d 545  (Mo. Ct. App. 1991).  "But actual fraud is not necessarily a predicate for piercing the corporate veil; it may also be pierced to prevent injustice or inequitable consequences." *Id.* (citing 18 Am. Jur. 2d Corporations § 50 (1985); 1 Fletcher Cyclopedia Corporations § 41.10 (1990)). Finally, Plaintiffs must set forth evidence that the alter ego company's act or omission proximately caused Plaintiffs' injuries.

### 2.    Plaintiffs' Evidence

Plaintiffs have set forth evidence on several of the eleven factors to be considered in determining control of a subsidiary corporation by a parent.

### a.    CenTra's Disputed Ownership of Pro Logistics

Deposition evidence and CenTra's pleadings establish a factual question as to whether CenTra owned Pro Logistics at the time of the collision.  CenTra argues that "[n]either Pro Logistics nor Central Transport, Inc. were wholly owned subsidiaries of CenTra, Inc. on the accident date."  In support of its argument, CenTra offers the deposition testimony of Norman Harned, CenTra's corporate representative, who, on May 2, 2007, confirmed that "Linc Logistics is the parent company of Pro Logistics."  (Harned Dep, 13, 15).  "[B]oth [Logistics Insight and Pro Logistics are] subsidiaries of LINC Logistics, which is a subsidiary of CenTra."  (Harned Dep., 9-10).[9]  CenTra also offers the minutes of annual meetings of the Shareholder of Pro Logistics, LINC Logistics Company

_____

[9]There is conflicting evidence even as to this claim.  According to Pro Logistics' Vice-President of Operations, CenTra did not own LINC Logistics "at the end of 2006."  (Golec Dep., 21).

15

dated June 25, 2005 and June 26, 2006.  (Doc. 597 Ex. D-2).

Yet competent evidence in the record disputes CenTra's assertion.  On July 23, 2007, Harold Wolfe confirmed at his deposition that CenTra, Inc., directly owned Logistics Insight Corp., Logistics Services, Inc., and Pro Logistics "prior to – the change occurred in December of 2006."  (Wolfe Dep., 10).[10]  In support of its original motion for summary judgment, CenTra stated that it is "[u]ncontroverted that CenTra, Inc. owned the stock of Pro Logistics, Inc. until the latter half of 2006.").  (Doc. 187 ¶ 14).[11] Inconsistencies between deposition and documentary evidence are factual questions which must be resolved by the jury.  *See Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.*, 2005 U.S. Dist. LEXIS 33204  (D.N.J. 2005); *Maritime Co. v. Mansion*, 1998 U.S. Dist. LEXIS 14724  (D. Kan. 1998).

### b.  Central Transport's and Pro Logistics' Undercapitalization

In its January 30, 2008 Order, the Court determined that Central Transport's negative net worth is a factor to be considered in whether a parent controls a subsidiary. CenTra argues that Central Transport's substantial negative net worth is irrelevant because "undercapitalization is not an issue in the case."  CenTra is incorrect.  Undercapitalization

---

[10]Wolfe referred to a list he had prepared showing his various positions with different companies.  (Doc. 589 Ex. C).

[11]CenTra further asserts that statements made by representatives of companies other than CenTra are not attributable to CenTra.  Fed. R. Ev. 801(d)(2)(D).  Even if true, CenTra's own statement as to its ownership is attributable to CenTra and statements from its subsidiaries' representatives are relevant evidence from which a reasonable juror could conclude that CenTra owned Pro Logistics until December 2006.

16

is a relevant inquiry under both the first and second *Collet* factors. *Paglin*, 834 F. Supp. at 1191-92 (citing *Collet v. American Nat'l Stores, Inc.*, 708 S.W.2d 273, 284 (Mo. App. 1986)). Thus, while Plaintiffs' theory of undercapitalization will not support the "improper purpose" element of the alter ego inquiry, it will provide evidence that CenTra controlled Central Transport. *Id.* Similarly, Pro Logistics' undercapitalization is relevant evidence that CenTra controlled Pro Logistics. (Doc. 275 Ex. Q).

### c. CenTra Caused Pro Logistics' Incorporation

CenTra next argues that the Court erred when it determined that CenTra formed Pro Logistics. CenTra is correct as to Harned's testimony which reads:

> I really don't know an individual that you can go to [to talk about CenTra's corporate structure]. There's probably many people that are involved in decisions to form these companies. I know Pro Logistics is a company that's formed because it does a particular type of motor freight operation and it has to have various licenses and authorities to perform that operation. GLS LeasCo is a leasing company. It doesn't need those – it doesn't do any transportation. So there's a reason for the company to be there. They do completely different types of business. (Harned Dep., 17).

The Court agrees that Harned does not specifically say that CenTra caused Pro Logistics to be incorporated. Yet Harned filed the Articles of Incorporation for Rouge Transportation of Michigan, Inc., which changed its name to Pro Logistics, Inc., in 2002. (Doc. 597 Ex. D-2). Given that Harned "worked for CenTra exclusively" since the mid-'70's," it remains a reasonable inference that CenTra caused Pro Logistics' incorporation. (Harned Dep., 6-7).

### d. Formal Legal Requirements

17

At the time of the collision, Central Transport provided administrative and safety services to Pro Logistics, without a written agreement, including monitoring which of Pro Logistics' drivers violated applicable motor carrier safety regulations. (Golec Dep., 45). Moreover, there is some evidence that Central Transport did have a written agreement with non-CenTra related companies for which it provided safety services. (Christ Dep., 22). CenTra does not dispute that no written agreement exists at least between Pro Logistics and Central Transport. The absence of such an agreement constitutes evidence that formal legal requirements were not observed. Any disputed fact as to "control" is to be resolved by a jury.

CenTra's subsidiaries also allocate entries to their budgets from a single overall budget. CenTra argues that "the written books and records of the separate companies reflected journal entries demonstrating that amounts were charged for the services." (Doc. 597, 10). CenTra argues that there is no issue of control where a single budget and annual allocation is "figured out for each of the CenTra, Inc. related companies." However, this evidence is certainly relevant to the question of control. (Christ Dep., 34).[12]

_____

[12]In support of its position, CenTra cites *Joiner v. Ryder Sys.*, 966 F. Supp. 1478 (C.D. Ill. 1996). In Joiner, the district court applied Illinois alter ego law to facts very similar to those set forth in *Kleweis*, which applied Missouri alter ego law. To the extent *Joiner* is persuasive, the Court must accord more weight to the *Kleweis* analysis. CenTra claims that under *Joiner*, "there is no control issue" when subsidiaries participate in a common cash management system. The court in *Joiner* stated that a parent may offer a centralized cash management system for a fee, which is not the case here. *Id.* at 1486. Similarly, the Court finds *United States v. Bliss* distinguishable because in that case, the district court was weighing the parent company's alleged control of its subsidiaries in analyzing minimum contacts for purposes of exercising jurisdiction which requires the higher evidentiary threshold of "clear evidence that the parent in fact controls the activities of the subsidiary." 108 F.R.D. 127, 131 (E.D. Mo. 1985) (citation omitted). Here, Plaintiffs need only set forth evidence to convince a reasonable juror that

18

### e.    CenTra, Central Transport Shared a Common Address

CenTra also argues that because subsidiaries' employees are segregated within the building located at 12225 Stephens Road in Warren, Michigan, CenTra does not control them.  However, even if the physical office space remained the same, there is evidence that subsidiaries' employees shifted in that space with some frequency.  For example, Joseph Golec, Pro Logistics' Vice-President of Operations, worked as a divisional vice-president for Central Transport for three years before working for Logistics Insight for under a year.  (Golec Dep., 10).  It will be for the jury to determine the significance of the Defendants' common address.

### f.    CenTra's Control Over Subsidiaries' Operations

Plaintiffs have set forth an example suggesting that CenTra had day-to-day control over Central Transport's and Pro Logistics' activities.  In July, 2007, Agnes Moroun, Central Transport's Vice-President of Human Resources, met with Manuel John Moroun to discuss a candidate Harold Wolfe, the President of Pro Logistics, had selected as his assistant and "heir apparent."[13]  (Moroun Dep., 15-16).  Specifically, Agnes Moroun testified:

> [Harold] Wolfe wanted to hire someone and I wasn't crazy about hiring that person but [Harold] Wolfe won.  And all I was doing was telling him that [Wolfe] wanted this person is going to be hired . . . it's [Harold] Wolfe's [ultimate decision].  He

---

CenTra controlled Pro Logistics or Central Transport.

[13]The person selected was to work at "LINC."  (Moroun Dep., 14).  Wolfe, who is President of LINC Logistics, Logistics Insight and Pro Logistics, reports to Manuel John Maroun, raising an additional inference of control.

wanted him. He got him. He has that authority. (Moroun Dep., 14).

CenTra is correct that a fair inference from the testimony is that "Mr. Moroun refused to follow Ms. Moroun's recommendation and overrule Wolfe" providing evidence of subsidiaries' independence. (Doc. 598, 12). Yet an alternative inference is that ultimate authority for personnel matters related to Central Transport and Pro Logistics lies with Manuel John Moroun. He was the final arbiter of the decision.

Plaintiffs have set forth evidence on several of the "control" factors identified in Missouri law. Because any combination of these factors may lead to a determination that the parent corporation sufficiently controls the subsidiary to allow piercing of the corporate veil, CenTra's motion is denied as to its control of its subsidiaries. *Paglin*, 834 F. Supp. at 1191-92 (citing *Collet v. American Nat'l Stores, Inc.*, 708 S.W.2d 273, 284 (Mo. App. 1986)).

### 3. Improper Purpose

CenTra argues that Chapter 390 of the Missouri Revised Statutes deals with administrative regulation and not trucking safety. Therefore, CenTra could not have violated Mo. Rev. Stat. § 390.171, and could not have used Central Transport or Pro Logistics for an improper purpose. CenTra bases this argument on the fact that, in 1984, the Missouri legislature transferred the authority to promulgate motor carrier safety rules from the Public Service Commission to the Department of Public Safety. Mo. Rev. Stat. § 307.400. Because the Missouri legislature incorporated the relevant motor carrier safety regulations into Chapter 307, instead of Chapter 390, CenTra argues that it must not have

20

intended Chapter 390 to deal with motor carrier safety. (Doc. 597, 14).

CenTra's position is without any support in Missouri statutes or case law. The stated purpose of Chapter 390 is to promote safe, adequate, economical and efficient transportation. Mo. Rev. Stat. § 390.011; *Omaha Indem. Co. v. Pall, Inc.*, 817 S.W.2d 491, 497 (Mo. Ct. App. 1991) ("It is well settled law that statutes such as § 390.126, RSMo. 1986, have been designed with the protection of the public as the paramount goal to be achieved."). All corporations subject to Chapter 390 are under the jurisdiction and supervision of the Missouri Division of Motor Carrier and Railroad Safety. Mo. Rev. Stat. § 622.090.7. Mo. Rev. Stat. § 390.171, provides that any

> owner . . . of any motor carrier who violates or fails to comply with or who procures, aids or abets in the violation of any provision of this chapter, or who fails to obey, observe or comply with any order, decision, rule or regulation, direction, demand or requirement of the division, or who procures, aids or abets any person in his failure to obey, observe or comply with any such order, decision, rule, direction, demand or regulation thereof is guilty of a misdemeanor. *Id.*

According to CenTra, in order to take advantage of the liability limiting protections of the corporate form, "a parent corporation must *not* exercise control over a subsidiary; yet if plaintiffs' theory is adopted, then a parent company is left with no choice but to actively control the subsidiary's conduct in order to avoid liability." (Doc. 598). Under different circumstances, CenTra may be correct. However, a parent corporation does not enjoy a right to limited liability based on corporate separateness, only a presumption based on the Missouri legislature's determination that it is a "socially reasonable and useful" policy. *Radaszewski v. Telecom Corp.*, 981 F.2d 305, 311 (1992). On issues particularly

21

affecting public safety, such as health regulations and rules of the road, federal and state legislatures will impose direct statutory duties which cannot be evaded by a claim to corporate separateness. *See State v. Graham*, 322 S.W.2d 188, 192 (Mo. Ct. App. 1959) ("If the act of the defendant made his employer liable under Section 390.176, then he became a person who "procures, aids or abets" in the violation under Section 390.171. Agents, accessories, aiders, and abetters are liable as principals and may be charged as such."). In this case, as noted in the Court's January 30, 2008 Order, the Missouri legislature cast a wide net in requiring that owners, directors, employees and agents of motor carriers complied with safety regulations. CenTra argues, in essence, that it can bury its head in the sand, even where its subsidiaries undertake dangerous, highly regulated activities. That argument has been rejected by Missouri courts. *State v. Graham*, 322 S.W.2d 188, 192 (Mo. Ct. App. 1959).

Indeed, with respect to negligence *per se* allegations, the negligent act will frequently be in the form of a failure to comply with an element of a statute or ordinance such as maintaining proper lighting or adequate brakes. *See Edwards v. Mellen*, 366 S.W.2d 317, 320 (Mo. 1963); *Darling v. J.B. Expedited Serv's, Inc.*, 2006 U.S. Dist. LEXIS 54000 (M.D. Tenn. 2006). Similarly, CenTra's claim that Missouri law "does not require a person to control the conduct of a third person as to prevent him from causing harm to another" is unavailing because Missouri law has imposed a statutory duty on motor carriers and their owners in the interest of the public safety. Mo. Rev. Stat. § 390.171.

CenTra argues that Plaintiffs must identify a parent corporation's "affirmative acts" in order to meet the second prong of *Collet*. In *Kleweis v. Transport Support, Inc.*, the district court determined that a manufacturer's failure to provide its subsidiaries with safety information in its possession created a genuine issue of material fact as to whether the parent company used its subsidiaries for an improper purpose. *Kleweis v. Transport Support, Inc.*, 972 F. Supp. 494, 495 (E.D. Mo. 1997). CenTra argues that in *Kleweis*, the parent company was "arguably the designer and manufacturer of the same kind of trailers" that had injured the plaintiff and therefore the parent company caused the hazardous condition and then suppressed evidence about its dangers. (Doc. 597, 5). CenTra is incorrect. In *Kleweis*, the alleged "sham corporate structure" was pierced where the manufacturing company, Delvan, merged with RAOI which in turn was owned by RACG which in turn was owned by RSI, "a holding company comprised of 100 subsidiaries including RAOI, [plaintiff's employer] and RACG." 972 F. Supp. at 494. While it is true that the plaintiff in Kleweis alleged that RSI "held itself out as" the manufacturer, the district court based its conclusion only on RSI's failure to provide safety information to an indirect subsidiary, RAOI. *Id.* at 495. *Kleweis* found a triable issue as to RSI's liability where it was 1) only a holding company, 2) failed to provide information and, 3) but for its failure to provide the information, plaintiff may not have been injured. *Id.*

Department of Transportation regulations impose hours-of-service limitations on truck drivers. Regulated motor carriers may not permit their drivers to drive more than ten hours after an eight-hour break, more than sixty hours per week, more than seventy hours

23

in an eight-day period, or after having been on duty fifteen hours.  See 49 C.F.R. § 395.3.

To enforce these limitations, the regulations further provide that commercial motor

carriers must require drivers to record their "duty status" for each twenty-four-hour period,

detailing on a prescribed form their time spent driving, resting in the vehicle's sleeper

berth, on-duty but not driving, and off duty.  *See* 49 C.F.R. § 395.8(b); *United States v.*

*McCord, Inc.*, 143 F.3d 1095, 1096 (8th Cir. 1998).  In this case, Plaintiffs have set forth

evidence that Pro Logistics "never checked Albright's logs for falsification or any kind of

false entries or accuracy."  (Guntharp Dep., 195-96).  Albright violated hours-of-service

limits and falsified his logbooks.  (Cummings Aff. ¶ 5).  A reasonable juror could

conclude that 1) CenTra controlled Central Transport and Pro Logistics; 2) CenTra knew

Pro Logistics had to comply with certain regulations in order to operate as a motor carrier;

3) CenTra nonetheless permitted the "segmentation of responsibilities and the failure of

anyone to have the appropriate oversight and controls" over drivers; which 4) caused

Plaintiffs injuries.  (Guntharp Report, 8) ("However, due to the attempt by Centra to

segment its holdings, no single company exercised ultimate responsibility for the Pro

Logistics Inc. safety and compliance programs.").  Plaintiffs have also set forth evidence

that this collision may be part of a pattern of collisions caused by improperly supervised,

hired or trained drivers employed by Pro Logistics.  (Cox Dep. 29, 64-65).  A reasonable

juror could conclude that CenTra, in essence, stayed willfully blind to its subsidiaries'

safety practices, having affirmatively set up this segmented process which CenTra could

reasonably foresee would cause harm to the public.  Nonetheless, CenTra now argues that

24

Central Transport's and Pro Logistics' separateness justifies its failure to ensure that its motor carriers observed federal and state motor carrier regulations. That theory is prohibited under Mo. Rev. Stat. § 390.171 and Missouri's alter ego law. *See Dwyer v. ING Inv. Co.*, 889 S.W.2d 902, 904-05 (Mo. Ct. App. 1994).

## IV. Conclusion

Plaintiffs have set forth sufficient evidence as to each element of a veil-piercing theory under Missouri law. Whether the fact finder concludes that the veil should be pierced is left for another day.

Accordingly, it is hereby

ORDERED that

1. CenTra's Motions to Dismiss [Docs. ## 560, 562] are DENIED.

2. CenTra's Motion to Reconsider [Doc. # 597] is DENIED.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: April 1, 2008
Jefferson City, Missouri

25